Case No. 16-3310

# United States Court Of Appeals
## FOR THE SIXTH CIRCUIT

IN RE: E. I. DU PONT DE NEMOURS AND COMPANY
C-8 PERSONAL INJURY LITIGATION

CARLA BARTLETT,

*Plaintiff-Appellee*

v.

E. I. DU PONT DE NEMOURS AND COMPANY,

*Defendant-Appellant*

On Appeal from the United States District Court for the Southern
District of Ohio, Case Nos. 2:13-cv-00170 & 2:13-md-02433

## BRIEF OF DEFENDANT-APPELLANT E. I. du PONT de NEMOURS AND COMPANY

Damond R. Mace
Stephen M. Fazio
Bruce A. Khula
Squire Patton Boggs (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8500
Fax: (216) 479-8780
damond.mace@squirepb.com

Pierre H. Bergeron
Colter L. Paulson
Lauren S. Kuley
Squire Patton Boggs (US) LLP
221 E. Fourth Street
Suite 2900
Cincinnati, Ohio 45202
Telephone: (513) 361-1200
Fax: (513) 361-1201
pierre.bergeron@squirepb.com

*Attorneys for Appellant E. I. du Pont de
Nemours and Company*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 6th Cir. R. 26.1, Defendant-Appellant E.I. du Pont de Nemours and Company ("DuPont") makes the following disclosures:

1.    DuPont is not a subsidiary or affiliate of a publicly-owned corporation.

2.    The Chemours Company ("Chemours"), a publicly-owned corporation, is a party to certain agreements with DuPont that require it to indemnify DuPont for payments made in connection with this case.  Chemours therefore has a financial interest in the outcome of this litigation.


<u>/s/ Pierre H. Bergeron</u>
Counsel for E. I. du Pont Nemours and
Company

i

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ......................................x

INTRODUCTION ...............................................................................1

JURISDICTIONAL STATEMENT ....................................................3

STATEMENT OF THE ISSUES.........................................................4

STATEMENT OF THE CASE............................................................4

    A.    The Leach Litigation and the Creation of the Science Panel .................................................................5

    B.    The Science Panel's Assessment of Kidney Cancer.................9

    C.    Mrs. Bartlett's Case Is The First Bellwether In The MDL......10

    D.    The District Court Decided That Exposure At 0.05 PPB For One Year Causes Kidney Cancer For All Class Members .................................................................11

    E.    The District Court's Other Rulings.........................................14

    F.    The Jury Verdict.........................................................14

SUMMARY OF ARGUMENT .............................................................15

ARGUMENT ......................................................................17

    I.    The District Court Adopted An Erroneous And Prejudicial Interpretation Of The Agreement.......................................17

        A.    The Court Nullified DuPont's Reserved Right to Contest Specific Causation...............................................18

            1.    The District Court's Transformation of "Probable Link".........................................................19

            2.    The District Court Erred By Transforming The 0.05 PPB Measurable Limit Into The "Standard" For Specific Causation.................................................23

3.    The District Court Erred By Stripping DuPont of Its Reserved Defenses...................................................27

4.    The District Court's Fears About Unraveling The Agreement Are Unfounded ..........................................31

B.    The District Court's Erroneous Interpretation of the Agreement Distorted the Evidence at Trial ............................32

II.    Plaintiff's Experts Manufactured A "Public Health Duty of Care" From The Inapplicable "Precautionary Principle," Violating Daubert and Ohio Law.....................................................38

A.    The Experts Created And Invoked An Erroneous "Public Health Duty Of Care." ...........................................38

B.    Dr. Siegel Improperly Couched His Testimony in Legal Parlance and Offered Legal Conclusions................................43

III.    The District Court Applied The Wrong Standard For Negligent Infliction Of Emotional Distress .....................................45

A.    Ohio Law Requires Severe And Debilitating Emotional Distress To Establish A Standalone Claim For NIED.............47

B.    Mrs. Bartlett Failed to Present Sufficient Evidence in Support of Her NIED Claim .....................................49

C.    In the Alternative, This Court Should Grant DuPont A New Trial on the NIED Claim.................................51

IV.    The District Court Erred By Refusing To Apply Ohio's Tort Reform Act .....................................................51

A.    Section 2315.18(B)(2) Of The Tort Reform Act Applies To Claims That Accrue After April 2005...............................52

B.    The Damages Cap Applies Because Mrs. Bartlett's Claims Did Not Accrue Until After April 2005 .....................55

CONCLUSION ...................................................................59

DESIGNATION OF DISTRICT COURT DOCUMENTS

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alexander v. Buckeye Pipeline Co.*,
  374 N.E.2d 146 (Ohio 1978) ...............................................................22

*B.F. Goodrich Co. v. United States Filter Corp.*,
  245 F.3d 587 (6th Cir. 2001) ..............................................................25

*Benson v. AJR, Inc.*,
  698 S.E.2d 638 (W. Va. 2010)............................................................30

*Berry v. City of Detroit*,
  25 F.3d 1342 (6th Cir. 1994) .......................................................43, 44

*Binns v. Fredendall*,
  513 N.E.2d 278 (Ohio 1987) ..............................................................48

*Blair v. McDonagh*,
  894 N.E.2d 377 (Ohio 2008) ..............................................................54

*Bower v. Westinghouse Elec. Corp.*,
  522 S.E.2d 424 (W.V. 1999) .................................................................7

*Breedlove v. Ohio DOT*,
  598 N.E.2d 242 (Ohio Ct. Cl. 1991)...................................................57

*Brown v. Ohio Dep't of Rehab. & Corr.*,
  2013 Ohio App. LEXIS 4186 (Sept. 17, 2013) ..................................47

*Browning v. Burt*,
  613 N.E.2d 993 (Ohio 1993) ........................................................53, 55

*Cent. W. Va. Energy Co. v. Wheeling-Pittsburgh Steel Corp.*,
  245 F. App'x 415 (6th Cir. 2007) .......................................................26

*Chesher v. Neyer*,
  477 F.3d 784 (6th Cir. 2007) ..............................................................53

*Coffman v. Dep't of Rehab. & Corr.*,
  2013 Ohio App. LEXIS 3995 (Sept. 5, 2013) ....................................47

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) .......... 15, 35, 37, 38, 39, 43

*DeLuca v. Merrell Dow Pharms., Inc.*,
    911 F.2d 941 (3d Cir. 1990) ............................................................22

*Digiannantoni v. Dillon*,
    1996 Ohio App. LEXIS 2542 (June 20, 1996) ...................................49

*Digital & Analog Design Corp. v. N. Supply Co.*,
    590 N.E.2d 737 (Ohio 1992) .......................................................52, 55

*Dunbar FOP, Lodge 119 v. City of Dunbar*,
    624 S.E.2d 586 (W.V. 2005) ............................................................30

*Elam v. Dhananjai Menzies*,
    594 F.3d 463 (6th Cir. 2010) ............................................................57

*Flagstar Bank, F.S.B. v. Airline Union's Mortg. Co.*,
    947 N.E.2d 672 (Ohio 2011) ............................................................59

*Gagne v. Nw. Nat'l Ins. Co.*,
    881 F.2d 309 (6th Cir. 1989) ............................................................50

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997).........................................................................41

*Hempy v. Breg, Inc.*,
    2012 U.S. Dist. LEXIS 14947 (S.D. Ohio Feb. 6, 2012) ............................ 54-55

*Hershberger v. Akron City Hospital*,
    516 N.E.2d 204 (Ohio 1987) ............................................................58

*Leach v. E. I. Du Pont de Nemours & Co.*,
    2002 WL 1270121 (W. Va. Cir. Ct. Apr. 10, 2002)............................5

*Liddell v. SCA Servs.*,
    635 N.E.2d 1233 (Ohio 1994) ..........................................................57

*Loudin v. Radiology & Imaging Servs.*,
    948 N.E.2d 944 (Ohio 2011) ............................................................48

*Lynn v. Allied Corp.*,
    536 N.E.2d 25 (Ohio App. 1987) ......................................................50

*Martin v. Cincinnati Gas & Elec. Co.*,
  561 F.3d 439 (6th Cir. 2009) ..............................................................27

*McClain v. Metabolife Int'l, Inc.*,
  401 F.3d 1233 (11th Cir. 2005) ..........................................................29

*McLane & McLane v. Prudential Ins. Co. of Am.*,
  735 F.2d 1194 (9th Cir. 1984) ............................................................21

*Menifee v. Ohio Welding Products, Inc.*,
  472 N.E.2d 707 (Ohio 1984) ..............................................................38

*Miller v. City of Columbus*,
  920 F. Supp. 807 (S.D. Ohio 1996) ....................................................49

*Musgrave v. Breg, Inc.*,
  2011 U.S. Dist. LEXIS 128101 (S.D. Ohio Nov. 4, 2011) .................55

*Myles v. Johns-Manville Sales Corp.*,
  459 N.E.2d 620 (Ohio Ct. App. 1983)................................................58

*Nelson v. Indevus Pharms., Inc.*,
  142 Cal. App. 4th 1202 (2006) ...........................................................58

*Nelson v. Tenn. Gas Pipeline Co.*,
  243 F.3d 244 (6th Cir. 2001) ........................................................36, 37

*Nimely v. New York*,
  414 F.3d 381 (2d Cir. 2005) ................................................. 41, 43-44

*Norgard v. Brush Wellman*,
  766 N.E.2d 977 (Ohio 2002) .................................................53, 56, 57

*Paugh v. Hanks*,
  451 N.E.2d 759 (Ohio 1983) .........................................................47, 49

*Perry v. Dep't of Rehab. & Corr.*,
  2013 Ohio App. LEXIS 3992 (Sept. 5, 2013) ...................................47

*Pluck v. BP Oil Pipeline Co.*,
  640 F.3d 671 (6th Cir. 2011) .....................................19, 27, 29, 36, 37

*Rhodes v. E. I. Du Pont de Nemours & Co.*,
253 F.R.D. 365 (S.D.W.V. 2008) ......................................................... 25-26, 30

*Roberts v. Hamer*,
655 F.3d 578 (6th Cir. 2011) ...............................................................52

*Ross v. Farmers Ins. Group of Cos.*,
1997 Ohio App. LEXIS 30 (Jan. 10, 1997) .........................................53

*Roto-Die Co. v. Lesser*,
1995 U.S. Dist. LEXIS 15684 (W.D. Va. Oct. 5, 1995) ....................31

*In re Sealed Case*,
67 F.3d 965 (D.C. Cir. 1995)................................................................45

*Stratford v. SmithKline Beecham Corp.*,
2008 U.S. Dist. LEXIS 84826 (S.D. Ohio June 17, 2008)..................55

*Tackett v. M&G Polymers USA, LLC*,
811 F.3d 204 (6th Cir. 2016) ........................................................18, 26

*Talley v. Family Dollar Stores of Ohio, Inc.*,
542 F.3d 1099 (6th Cir. 2008) ......................................................49, 50

*Tamraz v. Lincoln Elec. Co.*,
620 F.3d 665 (6th Cir. 2010) ...............................................39, 41, 42

*Terry v. Caputo*,
875 N.E.2d 72 (Ohio 2007) ..............................................................19

*Thorton v. Montville Plastics & Rubber, Inc.*,
902 N.E.2d 482 (Ohio 2009) .............................................................52

*Torres v. County of Oakland*,
758 F.2d 147 (6th Cir. 1985) .....................................................43, 44

*Treese v. City of Delaware*,
642 N.E.2d 1147 (Ohio App. 1994) .................................................53

*United States v. Barile*,
286 F.3d 749 (4th Cir. 2002) ............................................................45

*United States v. Meda*,
    812 F.3d 502 (6th Cir. 2015) ...............................................................18

*Valentine v. PPG Indus.*,
    821 N.E.2d 580 (Ohio 2004) ..............................................................22

*In re Welding Fume Prods. Liab. Litig.*,
    2005 U.S. Dist. LEXIS 46164 (N.D. Ohio Aug. 8, 2005)...................42

*In re Welding Fume Prods. Liab. Litig.*,
    2010 U.S. Dist. LEXIS 146067 (N.D. Ohio June 4, 2010) ..........40, 42

*Woods v. Lecureux*,
    110 F.3d 1215 (6th Cir. 1997) .............................................................44

*Yolton v. El Paso Tenn. Pipeline Co.*,
    435 F.3d 571 (6th Cir. 2006) ...............................................................18

## Statutes

28 U.S.C. § 1291 ...........................................................................................3

28 U.S.C. § 1332 ...........................................................................................3

Ohio Rev. Code § 2305.10................................................................53, 55

Ohio Rev. Code § 2315.18................................................................51, 52

## Other Authorities

1-17 Anderson's Ohio Consumer Law §17.03 ................................54, 55

Black's Law Dictionary (6th ed. 1990) .................................................22

Frank B. Cross, *Paradoxical Perils of the Precautionary Principle*, 53
    WASH. & LEE L. REV. 851 (1996).....................................................39

Holly Doremus, *Precaution, Science, and Learning While Doing in
    Natural Resource Management*, 82 WASH. L. REV. 547 (2007) .......40

D. Eaton, *Scientific Judgment and Toxic Torts – A Primer in
    Toxicology for Judges and Lawyers*,12 J.L. & POL'Y 5 (2003) ......29

Cass Sunstein, *Beyond The Precautionary Principle,* 151 U. Pa. L.
    Rev. 1003 (2003) ............................................................................... 40

Federal Judicial Center, Reference Manual on Scientific Evidence (3d
    ed. 2011) ......................................................................................... 23

Restatement (Third) of Torts: Liability for Physical and Emotional
    Harm § 28 (2010) ............................................................................. 19

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

This appeal concerns the first bellwether trial in a 3,500 case toxic tort MDL.  The district court has announced that the hundreds of cancer cases in this MDL will take priority and, using the first trial as its template, it will push cases rapidly to trial.  To accomplish this, the court plans to utilize a dozen other district judges to try 40 cases in 2017, in addition to the other bellwether trials scheduled for 2016 (including one that is on-going as this brief is being filed).  The significance of this appeal to the future course of the MDL accordingly cannot be overstated.  In addition, this appeal involves a voluminous record, complex scientific issues, and unsettled questions of state law.  For all of these reasons, E. I. du Pont de Nemours and Company ("DuPont") respectfully requests oral argument to aid the Court's decision-making process.

## **INTRODUCTION**

A threshold contract interpretation error eliminated the heart of a critical defense for DuPont in each of the 3,500 cases in this MDL.  Over a decade ago, DuPont reached an innovative settlement agreement involving approximately 80,000 class members exposed to a chemical called "C8" who were pursuing claims for medical monitoring, personal injury, and related relief.  Even though C8 had been used around the world since the early 1950s, there was no scientific consensus that it caused disease.  Seeking a science-driven resolution, the parties agreed that an independent panel of three epidemiologists would decide whether a "probable link" existed between C8 and various diseases.  If the scientists did not find such a link, class members would release their personal injury claims.  But for those conditions where the scientists reported such a link, DuPont would not contest *general* causation, *i.e.*, it would not dispute that C8 was capable of causing the linked disease.  However, the agreement expressly preserved all of DuPont's other defenses, including its right to contest *specific* causation.

The scientists found no probable links for over forty diseases, but they did find a probable link for kidney cancer, the disease at issue in this case.  Under the agreement, the focus at trial thus should have been on specific causation.  In toxic tort cases like this one, proof of specific causation typically entails expert testimony on epidemiological studies, where the plaintiff fits within those studies,

what those studies say about the likelihood of causation and amount of increased risk at the plaintiff's specific dose level, and an assessment of other factors that might affect risk.

But the trial court converted DuPont's promise not to contest general causation into an MDL-wide concession that *a plaintiff's individual level of exposure and level of risk did not matter*. The court instructed the jury that the scientists had determined that exposure to 0.05 parts per billion of C8 (the lowest measurable concentration of C8 at the time of the settlement) sufficed to cause kidney cancer – although the panel reached no such conclusion and instead differentiated risk based on the level of exposure. Based on that faulty premise, the court excluded evidence related to the amount of risk for Plaintiff's specific dose of C8, as well as evidence relating to what the C8 studies actually said. The court thus contorted an agreement based on science to bar DuPont from using basic scientific evidence to show the jury how Plaintiff's exposure to C8 actually affected her risk of disease. This effectively stripped DuPont of its specific causation defense.

This initial error of contract interpretation cascaded throughout the trial as the court invoked its 0.05 ppb "standard" as a litmus test to evaluate the admissibility of evidence. Because Plaintiff's experts embraced the court's "standard," it permitted them to assume specific causation without analyzing

2

Plaintiff's specific dose and the extent to which her risk was increased, if at all, by that dose. Conversely, the court excluded defense experts who would have testified that Plaintiff's dose of C8 did not materially increase her risk of cancer, and it excluded testimony that other factors more likely caused the disease.

Compounding these errors, the trial court: (1) allowed novel expert testimony grounding the standard of care in ethical principles like the "precautionary principle" and a created-for-trial "public health duty of care;" (2) eliminated the "severe and debilitating" requirement that Ohio law mandates for negligent infliction of emotional distress; and (3) failed to apply the Ohio Tort Reform Act, rejecting the views of other Ohio federal courts. For these and other reasons, this Court should reverse the judgment against DuPont.

## JURISDICTIONAL STATEMENT

The district court exercised diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff-Appellee Carla Bartlett is an Ohio resident, DuPont is incorporated and has its principal place of business in Delaware, and the amount in controversy exceeds $75,000. Am. Complaint, R.5, PageID64-66. This Court has appellate jurisdiction under 28 U.S.C. § 1291. Following entry of judgment, R.144, PageID6285, the district court's February 17 and March 22, 2016 orders disposed of all outstanding post-judgment motions, R.161, PageID8228; MDL4352,

3

PageID93249.[1]    DuPont's notice of appeal filed March 17, 2016, R.162, PageID8353, became ripe on March 22 under Fed. R. App. P. 4(a)(4)(B)(1).

## STATEMENT OF THE ISSUES

1.    Whether a new trial is warranted because the district court interpreted the parties' agreement to nullify DuPont's contractually-preserved right to contest specific causation.

2.    Whether the court erred by allowing Plaintiff's experts to testify that DuPont violated the "public health duty of care" and the "precautionary principle," which concepts conflict with DuPont's legal duties under Ohio negligence law.

3.    Whether the trial court erred by eliminating "severe and debilitating" emotional distress as an element of Plaintiff's standalone claim for negligent infliction of emotional distress.

4.    Whether the court erred by refusing to reduce the jury award under the Ohio Tort Reform Act, following one side of a split between Ohio federal courts regarding the accrual date of Plaintiff's claims.

## STATEMENT OF THE CASE

This appeal arises out of the first bellwether trial in a toxic tort multi-district litigation ("MDL") related to drinking water containing perfluorooctanoic acid

---

[1] "R." refers to the record in the *Bartlett* case, whereas "MDL" references the MDL record at 2:13-md-02433 (S.D. Ohio).  The district court held that the MDL filings are part of the record for this appeal.  Order, MDL4274, PageID85040.

4

("PFOA"), a chemical commonly called "C8." Beginning in the 1950s, DuPont used C8 as a processing aid at its Washington Works facility, situated along the Ohio River. C8 is a surfactant (like a detergent or soap) that is non-reactive and chemically stable. Trial Tr., R.135, PageID5354-55.

### A.    The *Leach* Litigation and the Creation of the Science Panel.

This MDL traces its roots to a 2001 class action against DuPont in West Virginia state court seeking medical monitoring and other relief as a result of C8 in community drinking water, which culminated in a 2004 settlement agreement (the "Agreement," MDL2813-1, PageID45944). *Leach v. E. I. Du Pont de Nemours & Co.*, 2002 WL 1270121 (W. Va. Cir. Ct. Apr. 10, 2002); *Leach* Order, MDL820-9, PageID11833-47. The district court's interpretation of the Agreement shaped the contours of the trial, guiding its rulings on causation and expert testimony.

The Agreement was an innovative response to a complicated mass tort case, where it was hotly disputed whether C8 could even harm humans. Class members had the same medical conditions that afflict any population, and while they attributed those conditions to C8 (pointing to C8's persistence in the environment and potential for bioaccumulation), no scientific or regulatory consensus existed that C8 was harmful to humans or, if so, at what exposure level(s).

Given that there were around 80,000 potential class members and a host of alleged medical problems, the parties decided to allow science to determine which

diseases might be linked to C8. Building on an approach used successfully in federal courts, the parties created a "Science Panel" to resolve the medical monitoring claims by deciding whether a "Probable Link" existed between C8 and human disease. Agreement, §12.2.3. As part of the settlement, DuPont paid $70 million to the class members, of which $20 million would "fund certain health and education projects," including a community study on the effects of C8. Agreement, §§9.1, 12.2.2. DuPont agreed to "install state-of-the-art water treatment technology … to reduce the levels of C-8 in the affected water supply to the lowest practicable levels," *id.*, §11.1, and to pay up to $235 million for future medical monitoring, if necessary. *Id.*, §§12.3.2, 12.4.

The Agreement defined the settlement class broadly as persons who drank water "containing a quantifiable (greater than or equal to .05 ppb) amount of C-8" from certain areas along the Ohio River for "at least one year." Agreement, §2.1.1. This class definition is the *only* place in the Agreement that refers to the 0.05 ppb value, which represented the minimum concentration of C8 that scientists could quantify at the time of the Agreement's execution in 2004. *Id.*; Deposition, MDL4228-2, PageID81678 (0.05 ppb represented "the minimum level where a result can be determined with known precision and accuracy"); Research Study, MDL2813-5, PageID46024-27. Accordingly, the class definition encompassed anyone in the area that drank water with measurable C8.

Comprised of three epidemiologists, the Science Panel was charged with determining if a "Probable Link" existed between C8 and any human diseases. *Id*. "Probable Link" was defined as "it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members." *Id*., §1.49. The Science Panel studied both class members and "all scientifically relevant data" including "workers" and "people in other communities." *Id*., §§12.2.2, 12.2.3.

The term "Probable Link" is a lower standard than causation. It derives from *Bower v. Westinghouse Elec. Corp*., 522 S.E.2d 424, 433 (W.V. 1999), which held that medical monitoring requires a showing of "a probable link between exposure to a particular compound and human disease" but not "that a particular disease is certain or even likely to occur as a result of exposure." "*Bower*," in fact, is a defined term in the Agreement, and a copy of *Bower* was provided to the Science Panel. Agreement, §1.6. Plaintiffs' counsel in *Leach* (some of the same attorneys here) acknowledged that the "Probable Link" standard "is a lower standard of proof than a finding of causation," emphasizing to the Science Panel that the "distinction between the causation standard and the more lenient 'probable link' standard of proof is of upmost importance." Bilott Ltr., MDL2823-1, PageID46913-14. The Panel confirmed they understood the difference, testifying before the West Virginia court in 2011 that "Probable Link" is "not causality," and

7

requires only "a modest level of certainty as science goes." *Leach*, Hearing Tr., 05/18/2011, at 85.

Consistent with the lenient Probable Link standard, the Agreement barred personal injury claims by class members with diseases for which the Science Panel made a "No Probable Link" finding. Agreement, §3.3. Conversely, if the Science Panel found a Probable Link, a class member with that disease could file a separate individual lawsuit. *Id*. In return for barring the No Probable Link claims, DuPont agreed that for class members with a linked disease, it would not "contest General Causation," defined as "it is probable that exposure to C-8 is capable of causing a particular human disease." *Id*., §1.25. A Probable Link finding yielded other consequences specified in the Agreement, but none relevant to this appeal.

The General Causation concession, while important, was narrow: DuPont preserved all of its other defenses in future individual lawsuits, including "reserv[ing] the right to contest Specific Causation," defined as "it is probable that exposure to C-8 caused a particular human disease in a specific individual." *Id.*, §3.3, §1.60. The Agreement used standard definitions for General or Specific Causation that tracked extant caselaw. *Id*. It also did not limit DuPont's right to present scientific evidence at trial about the circumstances or the level of exposure that would make it likely that C8 caused a disease in a specific individual.

### B.     The Science Panel's Assessment of Kidney Cancer.

After years of research, the Science Panel found no link between C8 and forty-one diseases, but it did find probable links with six diseases.  The Science Panel's Probable Link Reports, C8 Studies, and C8 Study Publications, among other things, are publicly available at http://www.c8sciencepanel.org/.   In its studies, the Panel divided subjects into categories of increasing exposure and made extensive use of C8 blood measurements and a dose-estimation model that provided a retrospective estimate of each subject's C8 exposure dating back to when the Washington Works Plant first began using C8.  For kidney cancer, the Panel evaluated exposure in three studies.  A "worker mortality study … showed a higher risk in the most highly exposed group compared to the lower exposure groups among the workforce, but the risks were not elevated compared to the US population."  Science Panel Report, MDL2813-4, PageID46017-19.  Similarly, a "[c]ohort study" found "a gradient of increasing risk with increasing exposure."  *Id*.  Finally, in a "[g]eographic study some results suggested an increasing risk of kidney cancer with increasing exposure and others did not."  *Id*.

The Panel found that a Probable Link existed between C8 and kidney cancer because the highest level of C8 exposure reflected a greater risk of cancer than the lowest levels.  *Id.*  Relevant to this appeal, the Panel observed little or no increased risk for those with medium and low exposures.  *Id*.  But even for higher exposures,

the risks noted by the Science Panel were either "not elevated" or "slight" compared to the overall U.S. population.  *Id*.; Cohen Expert Report, MDL2807-1, PageID42171, 42174-76.

Significantly, the Science Panel did *not* determine that 0.05 ppb for one year – or any other particular exposure (or dose) – was likely to cause cancer.  Science Panel Report MDL2813-4, PageID46010, 46014, 46020-21.  Rather, it observed that different levels of exposure resulted in different risk profiles, with risk increasing as cumulative exposure increased.  *Id*.  The Panel did not mention the 0.05 ppb number anywhere in its report – nor did it ever discuss that concentration as scientifically meaningful in its published studies.  *Id*.

## C.    Mrs. Bartlett's Case Is The First Bellwether In The MDL.

After the Science Panel issued its findings in 2012, around 3,500 individuals who lived in Ohio and West Virginia near DuPont's plant brought suit.  These cases were consolidated for pretrial purposes as *In re E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation*, 2:13-md-02433 (S.D. Ohio).  The first bellwether trial in the MDL involved Carla Bartlett and began in September 2015.  Order, MDL4183, PageID80074.

Mrs. Bartlett lived in the Tuppers Plains-Chester Water District in Ohio and was diagnosed with kidney cancer in 1997.  Trial Tr., R.131, PageID4606-13.  Doctors promptly and successfully removed her cancer, declared her "cured," and

10

she has remained cancer-free ever since.  Trial Tr., R.128, PageID3781-82, 3876-78.  At trial, Mrs. Bartlett asserted claims for negligence, negligent infliction of emotional distress, and punitive damages (other claims did not survive summary judgment or were abandoned).  Jury Instructions, R.140-1, PageID6229.  As described more fully below, had the court not excluded their testimony, DuPont's experts would have testified that Mrs. Bartlett received a relatively low dose of C8 that did not materially increase her risk of cancer.

### D.  The District Court Decided That Exposure At 0.05 PPB For One Year Causes Kidney Cancer For All Class Members.

In a key pre-trial ruling, the district court held that Mrs. Bartlett did not have to establish her individual dosage of C8 or how that related to her likelihood of risks.  Despite DuPont's reservation of its right to contest Specific Causation, the court held that individual plaintiffs were "not required to come forward with evidence proving that their *individual dosage of C8* is sufficient" to cause their disease.  Order, MDL1679, PageID22985 (emphasis added).  The court reiterated that Mrs. Bartlett did not need to prove "*her dose*" of C8 because the panel's Probable Link finding means that "it is 'more likely than not that there is a link between exposure to C-8 and *her kidney cancer*."  Order, MDL3972, PageID68171 (emphasis added).  The court believed that because the Science Panel determined "a link" existed between C8 and disease "among Class Members" (*see* Agreement, §12.2.3(b)), then the status of being a class member automatically meant an

11

individual plaintiff was exposed to enough C8 to cause her disease, regardless of her individual dosage.    *Id.*, PageID68165, 68172-74; Order, MDL4306, PageID89499, 89544; Order, MDL1679, PageID22985.

The district court then invoked the "0.05 ppb standard" to preclude DuPont's experts from offering opinions that C8 was not the most likely cause of Mrs. Bartlett's cancer.  Order, MDL3972, PageID68167.  For example:

- It barred DuPont's expert Dr. Cohen from testifying that Mrs. Bartlett's kidney cancer was more likely caused by morbid obesity than by her relatively low C8 exposure.  Order, MDL4226, PageID81632-35.

- The court similarly excluded Dr. Rickard's opinions that "[w]ith respect to specific causation there is no [toxicology] study that supports PFOA being able to cause kidney cancer at the exposure level claimed by Mrs. Bartlett." Order, MDL4079, PageID71855.

- It excluded Dr. Weed's opinions that "the risk of kidney cancer for individuals such as Mrs. Bartlett, with minimal exposure to C-8, are indistinguishable from a chance finding."  *Id*.

None of DuPont's experts were allowed to give a specific causation opinion based on Mrs. Bartlett's specific dose of C8.

After injecting the "Probable Link" finding into the trial, the court barred DuPont from telling the jury what the Science Panel actually found, including its

use of "risk quartiles" and analyses that showed differing risks for different exposure levels.    Trial Tr., R.147, PageID6514-15;  Order, MDL4079, PageID71856.   Yet it allowed Plaintiff's experts to portray as undisputed that exposure to 0.05 ppb of C8 for one year was all it took to cause Mrs. Bartlett's kidney cancer.  *See infra* at 35-37.   These rulings eliminated dose and risk (essentially, all of specific causation) as triable issues.   Therefore, the specific causation question submitted to the jury was distorted based on the court's predicate rulings.

The court even instructed the jury that 0.05 ppb was "the standard that the *Science Panel* came up with," and that the jury could not question the Science Panel's decision that "C-8 in that dosage for over a year causes kidney cancer." Trial Tr., R.154-1, PageID7283 (emphasis added); R.128-2, PageID3872. Extending DuPont's concession on general causation to specific causation, the court precluded the jury from deciding whether Mrs. Bartlett's specific dose of C8 could cause her cancer, telling them that "[t]he Science Panel has found that it does, and that's the end of it."   Trial Tr., R.128-2, PageID3872, 3875; R.157, PageID7929;  R.135, PageID5376-77.   Similarly, it forbade DuPont from explaining how Mrs. Bartlett's dose correlated to her level of risk.  *Id.*

Plaintiff's counsel embraced the court's 0.05 ppb "standard," proclaiming it the jury's "compass" and "beacon in the night."  Trial Tr., R.154, PageID7221-27;

R.145, PageID6362-68.  They emblazoned that "standard" on a large poster board displayed throughout trial.  *Id*.

### E.    The District Court's Other Rulings.

Three additional decisions are at issue in this appeal:  (1) The district court held that Plaintiff's experts could instruct the jury on the "public health duty of care" and the "precautionary principle."  Order, MDL4129, PageID78653, 78657. (2)  The court held that Mrs. Bartlett, who sought pain and suffering damages on her negligence claim, could also pursue a standalone claim for emotional distress without proving severe and debilitating distress as required by Ohio law.  Order, R.161, PageID8343.  (3)  It determined that the Ohio Tort Reform Act, which caps non-economic damages at $250,000, applies only to injuries that occur after its effective date, rather than to claims that accrue after that date.  Order, MDL4215, PageID81287.  These issues are discussed in detail below.

### F.    The Jury Verdict.

After a three-week trial, Mrs. Bartlett's claims went to the jury.  At the outset of their deliberations, the jurors asked to see the Science Panel report.  Trial Tr., R.146, PageID6496.  Consistent with its prior rulings, the district court refused that request.  *Id*.  The jury thus could not see what the Science Panel actually did, but instead had to rely on the portrayals by Plaintiff's counsel, their experts, and the court.

The jury returned a defense verdict on punitive damages, but awarded Mrs. Bartlett $1.1 million for pain and suffering on her negligence claim and an additional $500,000 for her claim for negligent infliction of emotional distress. *Id*., PageID6499.   The district court denied DuPont's post-judgment motions, and DuPont timely appealed.

## **SUMMARY OF ARGUMENT**

The district court erred by redefining the key terms of the Agreement, crippling DuPont's ability to challenge specific causation despite its express reservation of that right.  Instead of requiring Mrs. Bartlett to establish that her dose of C8 materially increased her risk of disease, the court redefined the term "General Causation" to include a specific, individual causation threshold that was never part of the parties' bargain.  The district court turned the "quantifiable" 0.05 ppb level for class membership into a transcendent "standard" sufficient to prove C8 caused her kidney cancer.

The court-created "standard" fundamentally reshaped the trial by allowing Plaintiff's experts to assume, rather than prove, specific causation.   Conversely, the court excluded defense expert opinions that analyzed Mrs. Bartlett's C8 dose, the risks associated with that dose, and whether her obesity more likely caused her cancer.  Not only did these rulings stem from a flawed premise (the underlying misinterpretation of the Agreement), but they also transgressed *Daubert*'s

15

requirement that experts consider a plaintiff's individual dose, and the increased risk it creates, before opining that exposure to a particular chemical was the specific cause of the plaintiff's disease.

The prejudice from these errors was compounded when the trial court allowed Plaintiff's experts to testify for days about a made-for-litigation "public health duty of care" theory, an amorphous notion grounded in the ethics-based "precautionary principle." Ohio negligence law asks what a reasonably prudent company would do under the circumstances. Yet the experts spent days lecturing the jury that, based on a subjective view of public ethics, DuPont violated a duty to inform the public of any contamination. They also couched their conclusions in legal terminology, effectively instructing the jury what its verdict should be.

In addition, the district court misinterpreted the legal standard for negligent infliction of emotional distress ("NIED"). Under Ohio law, if Mrs. Bartlett's fear of developing cancer arises separately from her earlier cancer, then she cannot recover without showing "severe and debilitating" emotional distress (which she failed to do, as the court had earlier ruled in dismissing her intentional infliction of emotional distress claim). But if, as the district court found, her distress arises contemporaneously from physical injury, then Ohio law requires her to pursue emotional distress as a component of pain and suffering damages in her negligence claim, not as a separate claim. Permitting Mrs. Bartlett to bring a standalone NIED

claim without satisfying the "severe and debilitating" standard allowed a double recovery in contravention of Ohio law.

Finally, the district court erred by refusing to apply the damages cap under the Ohio Tort Reform Act. The Ohio Supreme Court holds that new legislation applies to claims that accrue after the legislation becomes effective and that toxic tort claims accrue when an individual learns that the defendant caused her injury. Yet the court below decided that the Tort Reform Act applies only when the injury itself occurs after the legislation, and that Mrs. Bartlett's claims arose years before she ever heard about C8.

## **ARGUMENT**

### I.   **The District Court Adopted An Erroneous And Prejudicial Interpretation Of The Agreement.**

A chief issue at trial should have been whether Mrs. Bartlett received a high enough C8 dose to meaningfully increase her risk of kidney cancer and make C8 the likely cause. The Agreement preserved DuPont's right to contest specific causation, and DuPont proffered significant evidence about her dose and likelihood of risk, but the district court erased this right from the Agreement. Based solely on her class member status, the court held that Mrs. Bartlett received enough C8 to cause her kidney cancer and excluded almost all of DuPont's evidence related to dose and risk. A new trial is accordingly warranted. This Court reviews *de novo* both the threshold contract interpretation error and the resulting evidentiary

decisions. *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 577 (6th Cir. 2006) ("Questions of contract interpretation are generally considered questions of law subject to *de novo* review."); *United States v. Meda*, 812 F.3d 502, 511 (6th Cir. 2015) ("In reviewing a trial court's evidentiary determinations, 'this court reviews de novo the district court's conclusions of law....'").

## A.    The Court Nullified DuPont's Reserved Right to Contest Specific Causation.

The district court's contract interpretation error can best be understood as an improper interpretation of the class definition, the defined terms "Probable Link," "General Causation," and "Specific Causation," and how those terms interrelated and fit in the context of the Agreement. Its rulings defied the contractual text, eliminated DuPont's "clear and unambiguous" reservation of its specific causation defense, and ignored the express definitions of General and Specific Causation that "incorporate existing law." *Tackett v. M&G Polymers USA, LLC*, 811 F.3d 204, 208 (6th Cir. 2016).

As the court misinterpreted key terms in the Agreement, those errors built upon one another until the court had turned DuPont's promise not to contest General Causation into a concession on Specific Causation. The parties agreed that "'General Causation' shall mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease," whereas "'Specific Causation' shall mean that it is probable that exposure to C-8 caused a particular Human

18

Disease in a specific individual." Agreement. §1.25, 1.60. These definitions track the common framework for assessing causation in toxic tort cases: "(1) that the toxin is *capable of causing* the medical condition or ailment (general causation), and (2) that the toxic substance *in fact caused* the claimant's medical condition (specific causation)." *Terry v. Caputo*, 875 N.E.2d 72, 76-77 (Ohio 2007) (emphasis added). Specific causation requires a comparison between scientific studies and the circumstances of an individual plaintiff to assess whether, among other things, "the plaintiff was exposed to a comparable dose." Restatement (Third) of Torts: Liab. Physical Harm §28, cmt. c(4) (2010). As the Restatement explains, "[t]he intensity and duration of exposure (the 'dose') affects the magnitude of the risks posed and the likelihood of causation." *Id.*, cmt. (c)(2); *see also Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (6th Cir. 2011) ("level of exposure" is an issue of specific causation). The significance of the distinction between General and Specific Causation became lost as the district court reshuffled and redefined key terms in the Agreement.

1.    <u>The District Court's Transformation of "Probable Link"</u>

"Probable Link" became the vehicle through which the court rewrote the Agreement. Section 1.49 of the Agreement defines "Probable Link" as whether "it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members." Seizing on the words "among Class

19

Members," the district court held that a Probable Link finding meant that "the minimum exposure required to be a member of the class was sufficient to cause any disease." Order, R.161, PageID8273. Therefore, if a plaintiff could prove exposure to 0.05 ppb for one year, she was "not required to come forward with evidence proving that their individual dosage of C8 is sufficient" to cause her disease. Order, MDL1679, PageID22985. This reflected fundamental misunderstandings of the Agreement and the work of the Science Panel, imbuing the term "Probable Link" with far more significance than the Agreement ordains.

First, the court's use of "among Class Members" to redefine General Causation and Specific Causation shows no fidelity to the contractual text because neither definition incorporates the Probable Link definition. Agreement, §§1.25, 1.60. The Probable Link finding is only contractually relevant as the *trigger* for DuPont's promise not to contest General Causation. Its significance ends there, and the definition of General Causation (coupled with Section 3.3 of the Agreement) then establishes the scope of DuPont's promise. DuPont did not agree that the Probable Link finding itself would expand the definition of General Causation or trump its expressly-reserved Specific Causation defense. The court rewrote the Agreement by concluding that the Probable Link finding was not simply the event that triggered DuPont's promise, but rather a proxy for a dose sufficient to cause disease in each class member. Order, MDL3972, PageID68171;

20

Order, MDL4519, PageID98003 ("the Probable Link Finding establishes that it is more likely than not that there is a link between *that class member's exposure* to C-8 and *his or her Linked Disease*") (emphasis added).  Thwarting the intent of the parties and the plain language of the Agreement, the court substituted its understanding of the Probable Link finding for the science about C8's impact on Mrs. Bartlett's likelihood of risk.

Second, as a textual matter, the  "among Class Members" language does not establish that the Panel must find that *all* members of that group *must* have received a dose that caused their disease—but instead that the diseases of *some* class members *may be linked* to C8.  The court's idiosyncratic understanding of the word "among" disregards the parties' use of "among" in other corners of the Agreement.    Courts generally "presume that words have the same meaning throughout the contract."  *McLane & McLane v. Prudential Ins. Co. of Am.*, 735 F.2d 1194, 1195 (9th Cir. 1984).  Throughout its section about the Science Panel, the Agreement uses "among" in a collective, not individualized, fashion.  For example, it obligates the panel to establish "a protocol for a study of Human Disease *among* residents exposed to C-8 in the [relevant] communities." Agreement, §12.2.2 (emphasis added).  Similarly, the Agreement instructs the Science Panel to consider "data relating to C-8 exposure *among* workers, *among* people in other communities."  *Id.*, §12.2.3(b) (emphasis added).  "Among" in

these sentences does not necessitate studying the C8 exposure of "each" resident, "each" worker, or "each" person in sundry communities. *See also* Black's Law Dictionary (6th ed. 1990) ("Mingled with or in the same group or class. Intermingled with."). If the parties had intended the meaning envisioned by the district court, they would have said "in every individual Class Member" and DuPont would not have bothered to preserve its specific causation defense. *Alexander v. Buckeye Pipeline Co.*, 374 N.E.2d 146, 150 (Ohio 1978) ("If the parties had intended that an additional line could only be placed on either side of the first line, they could have easily so stated.").

Third, the district court's interpretation of the phrase "among Class Members" misunderstands the work of the Science Panel. The Panel was comprised of three epidemiologists tasked with conducting community studies. Agreement, §12.2.1. Epidemiological studies focus on group characteristics rather than individual causation. *Valentine v. PPG Indus.*, 821 N.E.2d 580, 594-95 (Ohio 2004) ("Epidemiologic studies are conducted on groups of individuals."); *DeLuca v. Merrell Dow Pharms., Inc.*, 911 F.2d 941, 945 (3d Cir. 1990) ("Epidemiological studies do not provide direct evidence that a particular plaintiff was injured by exposure to a substance."). "Epidemiology is concerned with the incidence of disease in populations, and epidemiologic studies *do not address the question of the cause of an individual's disease*. This question, *often referred to as specific*

22

*causation*, is beyond the domain of the science of epidemiology." Federal Judicial Center, Reference Manual on Scientific Evidence 608-09 (3d ed. 2011) (emphasis added) [hereinafter, FJC Reference Manual].

Reinforcing these points, the Agreement never directs the Science Panel to study the 0.05 ppb exposure level, and indeed, the section creating the Science Panel never mentions that figure. Consistent with the Science Panel's role defined in the Agreement, its report on kidney cancer does not analyze the 0.05 ppb value, nor does it purport to make individual causation findings. Science Panel Report, MDL2813-4, PageID46010. Far from proclaiming that exposure and dose did not matter, the Panel found an increased risk in higher exposure categories of C8, and little or no increased risk (and sometimes a lower risk) for class members with medium and low exposures. *Id*., PageID46014. In short, the 0.05 number defines simply who is in the class; it does not determine the effects of C8 on individual class members.

2.    The District Court Erred By Transforming The 0.05 PPB Measurable Limit Into The "Standard" For Specific Causation.

Nevertheless, the district court placed great weight on the 0.05 ppb figure, embellishing it as a "standard" that redefined the Agreement and the trial. As the court explained to the jury: "The Science Panel conducted a study and concluded that there is a probable link *between a certain level of C-8* in the drinking water and kidney cancer. *That level – and you'll hear testimony on his – is .05 parts per*

23

*billion*."  Trial Tr., R.154, PageID7164 (emphasis added).  The Science Panel, of course, reached no such conclusion.

This "standard" finds no mooring in the contractual text.  The only place in the Agreement that mentions the 0.05 ppb level is the class definition, which provides that individuals qualify as class members if they drank water "containing a quantifiable (greater than or equal to .05 ppb) amount of C-8" for a year. Agreement, §2.1.1.  This 0.05 ppb concentration merely represented the level of C8 that was "quantifiable" (*i.e.*, measurable or assessable) at the time of the Agreement.  *Id.*  This minimal amount was not designed to be a threshold sufficient to establish Specific Causation.

The district court mistakenly assumed that the parties intended the "minimum exposure required to be a member of the class" to be "sufficient to cause any disease" in a specific plaintiff.  Order, R.161, PageID8273.  Yet the definitions of "General Causation," "Specific Causation," and "Probable Link," contain no references to the 0.05 ppb amount, and the Agreement nowhere establishes this value as the Specific Causation benchmark.  Agreement, §§1.25, 1.49, 1.60.  After all, the parties commissioned the Science Panel to study a multitude of diseases, with various symptoms and causes.  C8 would inevitably impact each disease (if at all) in different ways at different exposure levels.  And kidney cancer itself comes in many forms, each affecting the kidney in disparate

ways and with varying risk factors. Cohen Expert Report, MDL2807-1, PageID42159-60. The Agreement does not provide that Specific Causation for all of these diverse conditions should be presumed as a result of the Science Panel's generalized Probable Link finding for "kidney cancer." The class definition is what it purports to be—it does not implement a one-size-fits-all causation solution for all diseases and all class members. The district court's elevation of the 0.05 ppb level into a transformative criterion establishing the exposure that is sufficient to specifically cause the diseases of each class member cannot be squared with the language or context of the Agreement. *B.F. Goodrich Co. v. United States Filter Corp.*, 245 F.3d 587, 591 (6th Cir. 2001) ("[A]s a matter of contract interpretation," the class definition "could not have the meaning urged by [the court] when considered in the context of the contract as a whole.").

The district court's ruling also conflicts with another district court's assessment of the same agreement in *Rhodes v. E. I. Du Pont de Nemours & Co.*, 253 F.R.D. 365 (S.D.W.V. 2008). In the class certification context of *Rhodes*, the plaintiffs emphasized that C8 levels exceeded the 0.05 ppb level described in the Agreement. *Id*. at 375. But the court held that the 0.05 ppb level had no independent significance other than defining class membership, recognizing that "[t]hat level did not constitute a concession by DuPont about the quantity of C-8 that must be in drinking water to effect a significant exposure." *Id.* at 375. It

explained that the level says "nothing" about how the plaintiffs' "C-8 exposure level compares to the level of C-8 exposure experienced by the general population." *Id.*

Such distinctions eluded the court below, as it redefined causation by incorporating the 0.05 ppb level. As it explained to the jury: "[Y]ou won't be deciding that first question of whether or not C-8 *in that dosage* for over a year causes kidney cancer. The Science Panel has found that it does, and that's the end of it." Trial Tr., R.128-2, PageID3872 (emphasis added). DuPont was not allowed to refute this Specific Causation "standard" at trial. It is axiomatic that unambiguous language "must be construed according to the plain and natural meaning of that language." *Cent. W. Va. Energy Co. v. Wheeling-Pittsburgh Steel Corp.*, 245 F. App'x. 415, 422 (6th Cir. 2007) (applying West Virginia law).[2] Yet the district court interpreted General Causation to mean that there was "a link between *that class member's* exposure to C8 and *his or her* linked disease." Order, MDL4079, PageID71854 (emphasis added). This turns an issue of *general* causation into a determination of the effect of C8 on an individual, which is by definition *specific* causation. If the parties had intended to reject the traditional concepts of causation and radically reshape their meanings, they would have said so. *See Tackett*, 811 F.3d at 209 ("contracts incorporate existing law").

---

[2] The Agreement is governed by West Virginia law, but Plaintiff's claims arise under Ohio law. Order, MDL4306, PageID89508.

26

The district court's "standard" was tantamount to a conclusion that there is "no safe dose" of C8 because any "quantifiable" amount of C8 absolved Plaintiff of proving that C8 caused her disease. This Court has rejected such theories because they effectively shift the burden of proof to the defendant. *Pluck*, 640 F.3d at 675 (the "'no safe dose' theory [has] been discredited by other courts as a basis for establishing specific causation"); *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009) (rejecting argument that "any exposure is a substantial cause" because "[t]his argument would make every incidental exposure to asbestos a substantial factor"). The parties did not intend DuPont's reservation of the right to contest Specific Causation to be an empty gesture.

### 3. The District Court Erred By Stripping DuPont of Its Reserved Defenses.

Having redefined the Science Panel's work, Probable Link, and General Causation, the court relied on these interpretive missteps to reach its conclusion – which it gave to the jury – that, no matter what "other causations" DuPont might be able to prove, "C-8 caused Mrs. Bartlett's condition." Trial Tr., R.128-2, PageID3875. Mrs. Bartlett no longer needed to prove anything related to her dose and risk, as required by Ohio law, but only needed to prove exposure to 0.05 ppb of C8 for one year. And DuPont could no longer present scientific evidence regarding the circumstances that could cause disease or how the risk varied with the level of exposure.

Although the actual Agreement did not artificially constrain DuPont's ability to defend Specific Causation, the district court improperly rewrote the Agreement by holding that "the dosage level of C-8 that can cause these diseases is a general causation issue, which DuPont clearly agreed to not contest."  Order, R.161, PageID8262.  This meant that "the individual plaintiffs are not required to come forward with evidence proving that their individual dosage of C-8 is sufficient."  Order, MDL1679, PageID22985.  Thus, "any issue about the C-8 dosage and whether it's sufficient to have caused [Mrs. Bartlett's disease] is off the table."  Order, R.161, Page ID8262.  In short, the court's conflation of individual dose and risk with General Causation effectively eliminated DuPont's contractual right to challenge Specific Causation.

The court's revised framework ignored DuPont's reserved right to contest "Specific Causation," defined as whether "it is probable that exposure to C-8 caused a particular Human Disease *in a specific individual*."  Agreement, §1.60 (emphasis added).  DuPont similarly reserved the "right to contest Specific Causation and damages as to *any individual Class Member*."  *Id*., §3.3 (emphasis added).  Importantly, these specific reservations were part of a broad preservation of all defenses not explicitly "barred by th[e] Agreement."  *Id*.  By contrast, DuPont's agreement not to contest General Causation was a narrowly-drawn exception to that rule.  *Id.* §3.3.

28

Even where general causation is undisputed, individual dosage represents a critical component of specific causation, as this Court has explained: "As to specific causation, [t]he plaintiff must show that ... the level of exposure was sufficient to induce the complained-of medical condition." *Pluck,* 640 F.3d at 677 (quoting Ohio authority). Once "general causation" has been established "for a given chemical, then it must be established that the individual's dose over a defined period of time was sufficient to cause the alleged health effect. It is not adequate to simply establish that 'some' exposure occurred." D. Eaton, *Scientific Judgment and Toxic Torts – A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & POL'Y 5, 9 (2003) [hereinafter "FJC Toxicology Primer"].

Toxic tort claims require "not simply proof of exposure to the substance, but proof of enough exposure to cause the plaintiff's specific illness." *Pluck*, 640 F.3d at 679 (*quoting McClain v. Metabolife Int'l, Inc*., 401 F.3d 1233, 1241 (11th Cir. 2005)). "[D]ose is the ***single most important factor*** to consider in evaluating whether an alleged exposure caused a specific adverse effect." *McClain*, 401 F.3d at 1241 (emphasis added; quoting FJC Toxicology Primer). Not surprisingly, the Science Panel's report and published studies emphasized the significance of dose, explaining that the increase in risk was non-existent or minimal at lower exposures, and only higher at greater exposures categories.

29

The district court's creation of the 0.05 ppb "standard" also reflects a misunderstanding of the concepts of "dose" and "exposure." "Dose" is an inherently individualized concept used in specific causation, calculated from the amount of chemical that "enters the body" relative to the "body weight" (expressed as mg/kg bw). FJC Toxicology Primer at 11. In contrast, "exposure" is a generic measure of concentration in the water (typically expressed in "parts per billion" or "million"), not the amount an individual ingests or accumulates. *See id.* The 0.05 ppb "standard" thus cannot represent "dose" necessary for specific causation. As explained in *Rhodes*, 253 F.R.D. at 375-76, the 0.05 ppb concentration was an "exposure" to "a common source of drinking water," and did not reflect "the C-8 levels in the named plaintiffs' blood." The court below missed this important distinction when it eliminated dose as an issue at trial.

Because DuPont preserved "any ... defenses not barred by th[e] Agreement," including Specific Causation, basic principles of contract interpretation dictate that DuPont should have been permitted to present its defense that Mrs. Bartlett's low dose did not materially increase her kidney cancer risk and, therefore, was not the likely cause. *See Benson v. AJR, Inc.*, 698 S.E.2d 638, 648-49 (W. Va. 2010) ("it is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract"); *Dunbar FOP, Lodge 119 v. City of Dunbar*, 624 S.E.2d 586, 591 (W.V.

2005) ("'specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract'"). DuPont's broad reservation of rights with the limited exception for General Causation should be effectuated. *Roto-Die Co. v. Lesser*, 1995 U.S. Dist. LEXIS 15684, *7-8 (W.D. Va. Oct. 5, 1995) ("Again, the Release is broad, and consequently I narrowly construe the exceptions."). Because the Agreement did not expressly waive DuPont's ability to defend based on dose, it constitutes part of DuPont's reserved defenses.

### 4.    The District Court's Fears About Unraveling The Agreement Are Unfounded.

The district court's interpretation cannot be salvaged by its concern that allowing DuPont to contest risk and dose would unravel the Agreement, which perpetuates a misunderstanding of how the Agreement operates. Order, R.161, PageID8268. DuPont's position is that no class member with a linked disease needs to prove General Causation. But General Causation only considers if a chemical is "capable of causing" a condition, not the individualized questions of the circumstances or dose and whether that creates a meaningful increase in risk for the individual's disease. FJC Reference Manual at 638 ("in most specific causation issues involving exposure to a chemical known to be able to cause the observed effect, *the primary issue will be whether there has been exposure to a sufficient dose to be a likely cause of this effect*") (emphasis added). As explained

31

above, the court's concern flows from a misapprehension of settled law on the distinction between general and specific causation. Allowing DuPont to raise these defenses comports with the Agreement's text and effectuates the parties' intent.

### B. The District Court's Erroneous Interpretation of the Agreement Distorted the Evidence at Trial.

The district court prevented the jury from considering issues related to dose and risk that represented the cornerstone of DuPont's Specific Causation defense. The trial should have explored scientific data and analysis about how C8 might affect an individual like Mrs. Bartlett at her specific dosage levels, and what other issues might have contributed to her risk. Yet, the district court's interpretation of the Agreement (ironically, an Agreement forged on science) led it to jettison the most basic scientific analysis germane to Specific Causation. These prejudicial errors require a new trial.

Whenever DuPont tried to present evidence at trial about dosage, risk, or scientific studies of C8, to the extent that such evidence came in at all, the court was quick to instruct that such evidence – the core of specific causation – "has nothing to do with Mrs. Bartlett." Trial Tr., R.130-2, PageID4466. The court went so far as to instruct the jury (counterfactually) that the 0.05 ppb concentration was "the standard that the Science Panel came up with." Trial Tr., R.154-1, PageID7283. Illustrating how far afield this allowed Plaintiff to stretch, her counsel argued in closing that the "Science Panel found that it only takes a year of

drinking this amount.  One year of .05. ... There are other cancers, we all know, smoking, asbestos, take a lifetime of exposure before something may happen.  This one, all you need is a year."  Trial Tr., R.145, PageID6362.  This was factually wrong in every possible way—but it reflected the essence of what the court conveyed to the jury.

The district court excluded all opinions by DuPont's experts that Mrs. Bartlett's individual dose of C8 was unlikely to have materially increased her risk of kidney cancer.  Order, MDL4079, PageID71861;  Order, MDL3972, PageID68167.  It barred DuPont's expert medical doctor, Dr. Cohen, from providing his opinion that her morbid obesity was far more likely to be the cause of her kidney cancer than her relatively low C8 dose, which would not result in a statistically significant increase in her risk of kidney cancer.  Order, MDL4226, PageID81632-37.  Dr. Cohen evaluated C8 as a possible cause of her cancer, but determined that, even with the required General Causation assumption that C8 can cause kidney cancer, her individualized risk of developing kidney cancer was not materially increased by her low dose.  Cohen Expert Report, MDL2807-1, PageID42174-76.  The court excluded this testimony on the eve of trial because Dr. Cohen did not adopt the 0.05 ppb value as the causation standard.  Order, MDL4079, PageID71861; *see id.* at PageID71850-55.  Plaintiff's counsel thus

33

highlighted at trial that Dr. Cohen "did not give an opinion" on the etiology of Mrs. Bartlett's cancer. Trial Tr., R.133, PageID5273.

The court similarly excluded toxicologist Dr. Rickard's opinions that "[w]ith respect to specific causation, there is no [toxicology] study that supports PFOA being able to cause kidney cancer at the exposure level claimed by Mrs. Bartlett." Order, MDL4079, PageID71855. Dr. Rickard would have testified that "dose is critical to determining what effect, if any, will occur in an individual from exposure to a substance." Rickard Expert Report, MDL2807-4, PageID42520. Drawing on scientific studies, he would have laid bare the lack of scientific support for the claim that C8 increased the risk of kidney cancer at the specific low-dosage levels claimed by Mrs. Bartlett. *Id*., PageID42520-24, 42529-34, 42537-40. But the court refused to allow him to present any such analysis to the jury.

In similar vein, the court excluded epidemiologist Dr. Weed's opinions that "the risk of kidney cancer for individuals such as Mrs. Bartlett, with minimal exposure to C-8, are indistinguishable from a chance finding." Order, MDL4079, PageID71855. He would have discussed the Science Panel's studies, showed how they related to Mrs. Bartlett's specific exposure, and explained that her risk from C8 was "indistinguishable from the risk due to [other] known risk factors for kidney cancer." Weed Expert Report, MDL2807-9, PageID42979. The court similarly excluded DuPont's exposure expert Dr. Washburn's opinion that Mrs.

34

Bartlett had lower-than-average C8 exposure and risk. Washburn Expert Report, MDL2807-8, PageID42869.

Further, despite DuPont's and the jury's request, the district court, after injecting the Science Panel's report into the case, refused to allow any discussion of its details. *See* Trial Tr., R.147, PageID6514-15; R.146, PageID6496. The court allowed Plaintiff to bolster the Science Panel's report and transform it into a declaration of Specific Causation, but then stopped DuPont's experts from explaining that the Science Panel's conclusion of increased risk was only associated with dosages higher than that received by Mrs. Bartlett. Trial Tr., R.155-1, PageID7517; R.128-1, PageID3805-08, 3823-24. Because DuPont's only contractual concession was General Causation, the Science Panel's report (and published studies) should have been treated like any other scientific paper: if Plaintiff desired to rely on it, the report should have been submitted consistent with *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), through expert testimony, with response expert testimony as appropriate. Hiding the report from the jury while effectuating a broad mischaracterization of its contents was not what DuPont bargained for.

Exploiting the court's "standard," Plaintiff's experts proclaimed it undisputed that any exposure to 0.05 ppb for one year caused kidney cancer. Eschewing any analysis that would satisfy *Daubert*, Dr. Bahnson based his

conclusion that C8 was "a substantial factor in causing Mrs. Bartlett's cancer" on the court's erroneous contract interpretation that class members' 0.05 ppb exposure causes kidney cancer. Trial Tr., R.128-1, PageID3823-24. He presented no analysis of Mrs. Bartlett's actual risk based on her individual dosage of C8. *Id.* Dr. Bahnson used an unreliable differential diagnosis that "ruled in" a low-level C8 exposure as the cause of her cancer "without proof that the level of exposure could cause the plaintiff's symptoms"—a practice this Court rejected in *Pluck*, 640 F.3d at 679.

In *Pluck*, after assuming general causation, this Court highlighted the important distinction between general and specific causation: "*the mere existence of a toxin* in the environment is insufficient to establish causation without proof that *the level of exposure* could cause the plaintiff's symptoms." 640 F.3d at 674, 679 (emphasis added). Despite the fact that the plaintiff established a general level of benzene in the water (ranging from 1.8 to 3.6 ppb), the plaintiff "failed to quantify Mrs. Pluck's dose," and failed to provide evidence that chronic "low-level exposure" to benzene could cause her disease. *Id.* at 674-77. These deficiencies were fatal flaws in the plaintiff's claim of specific causation. *Id.*; *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252-53 (6th Cir. 2001) (PCBs "in excess of allowable limits" could not establish specific causation unless plaintiffs were "exposed at a level that could cause neurological and lung impairments").

36

Dr. Siegel, another Plaintiff's expert, also invoked the court's rulings to justify his testimony that "a level of 0.05 parts per billion is sufficient to cause human disease" and, without any basis other than the court's order, even told the jury that the Science Panel "said the level should not be anything higher than .05 for more than a year." Trial Tr., R.155-2, PageID7445, 7573. He testified that "a level of .05 parts per billion was sufficient for an individual to experience carcinogenic or other health effects."[3] *Id.*, PageID7517. None of these experts even attempted to quantify the risk associated with Mrs. Bartlett's actual dosage of C8. The court nonetheless allowed them to wield its 0.05 ppb "standard" to opine that a minimal exposure to C8 caused Mrs. Bartlett's kidney cancer. Order, MDL4079, PageID71863, 71866, 71869-70.

Because Plaintiff's experts relied on the district court's erroneous contract interpretation to support their causation opinions, their testimony was unreliable under *Pluck* and *Daubert*—and insufficient to support the judgment. *Nelson*, 243 F.3d at 252-53 (excluding expert witness who "made no attempt to determine what amount of PCB exposure" the plaintiffs received). The resulting prejudice deprived DuPont of both its contractual rights and a fair trial.

---

[3] Underscoring the impropriety of such testimony, Plaintiff's experts testified that a few sips of water every four months for a year sufficed to render someone a class member. Expert Depo., MDL3066-1, PageID49866-67.

## II.    Plaintiff's Experts Manufactured A "Public Health Duty of Care" From The Inapplicable "Precautionary Principle," Violating *Daubert* and Ohio Law.

This Court should also grant a new trial based on the district court's abuse of discretion in allowing improper testimony from Plaintiff's primary expert, Dr. Michael Siegel (echoed by another expert, Stephen Petty). Ohio law required the jury to decide (1) whether DuPont had a "duty of care," which exists if a company knows or should have known that its conduct was likely to cause harm; and (2) whether DuPont breached that duty by failing to use "the care a reasonably prudent corporation would use in similar circumstances." Jury Instructions, R.140-1, PageID6251-53; *Menifee v. Ohio Welding Products, Inc.*, 472 N.E.2d 707, 710 (Ohio 1984). These experts short-circuited this analysis by testifying that DuPont breached a "public health duty of care" that they created—and which directly conflicts with the legal standard for the duty of care under Ohio law. The court allowed these experts to dwell on such matters for days, focusing the jury's attention on confusing and inapplicable standards and improper legal opinions.

### A.    The Experts Created And Invoked An Erroneous "Public Health Duty Of Care."

Testimony about the "public health duty of care" (or the "precautionary principle") consumed hundreds of transcript pages across several days of trial. Trial Tr., R.149, 155, 156, 157. Dr. Siegel invented a "public health duty of care" for the jury, an amorphous and confusing concept he based on the "precautionary

38

principle" that sits at the "core of public health ethics." Trial Tr., R.155-2, PageID7552-53; R.156, PageID7705-06, 7718, 7741. The precautionary principle, which is primarily an ethics or regulatory tool, requires "precautions to protect public health and the environment, even in the absence of clear evidence of harm and notwithstanding the costs of such action." Frank B. Cross, *Paradoxical Perils of the Precautionary Principle*, 53 WASH. & LEE L. REV. 851, 851 (1996).

This Court's decision in *Tamraz* noted that a precautionary principle may be useful in some non-lawsuit circumstances, such as a physician's practice: "If a particular factor might cause a disease, and the factor is readily avoidable, why not advise the patient to avoid it?" *Tamraz v. Lincoln Elec. Co*., 620 F.3d 665, 673 (6th Cir. 2010). But *Tamraz* also explains why this principle cannot inform the jury's decision: "This low threshold for making a decision serves well in the clinic but not in the courtroom, where decision requires not just an educated hunch but at least a preponderance of the evidence." *Id*.

Plaintiff identified no case in any jurisdiction permitting expert testimony on the "public health duty of care" or the "precautionary principle" in a tort case, and the district court erred by breaking this new ground:

First, *Daubert* requires expert opinions to rely on facts analyzed with a sound methodology. The precautionary principle, in contrast, "provides normative judgments" about how data "should be translated into individual and societal

action." Holly Doremus, *Precaution, Science, and Learning While Doing in Natural Resource Management*, 82 WASH. L. REV. 547, 558-60 (2007). Professor Sunstein explains that the principle skews the cost-benefit analysis with moral and social judgments about what benefits and costs to ignore. Cass Sunstein, *Beyond The Precautionary Principle,* 151 U. PA. L. REV. 1003, 1055-57 (2003) ("A rational system of risk regulation certainly takes precautions. But it does not adopt the precautionary principle."). Another Ohio court excluded expert testimony based on the precautionary principle as not "coterminous" with Ohio law because it inevitably measures conduct by the "moral or social standard held by an expert." *In re Welding Fume Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 146067, *146 (N.D. Ohio June 4, 2010); *compare with* Trial Tr., R.155-2, PageID7551-53; R.157-1, PageID7970-71; R.157-2, PageID8046.

Tellingly, Plaintiff's experts expressly declined to do a comparative analysis between DuPont's knowledge and conduct with those of other companies that manufactured or used C8—or any company in the chemical industry for that matter. Trial Tr., R.156-1, PageID7762-65 ("I just haven't studied other chemical companies to compare their conduct with DuPont."); *see also* Trial Tr., R.129-1, PageID4091 (similar testimony by Mr. Petty). Dr. Siegel freely admitted that he had no "special training in – or study in the chemical industry." Trial Tr., R.157-1, PageID8031-32. Because the experts relied on their own feelings about what risks

40

were appropriate, their opinions show nothing but "unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion that the district court has the duty to exclude under Rule 702." *Nimely v. New York*, 414 F.3d 381, 399 (2d Cir. 2005); *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (opinions improper when supported "only by the *ipse dixit* of the expert").

Blissfully unaware of what "reasonably careful companies" would do under similar circumstances, these opinions represented subjective value judgments. As this Court explained in *Tamraz*, 620 F.3d at 675: "The important thing is not that experts reach the right conclusion, but that they reach it via a sound methodology." Here, the "public health duty of care" created by Dr. Siegel is not a product of any methodology, sound or otherwise.

Second, although a reasonably prudent company evaluates potential risks to the public, Dr. Siegel told the jury that his precautionary principle-based "standard of care" requires a company to take immediate action if a chemical has even the "potential" to be hazardous. Trial Tr., R.156-1, PageID7705-06, 7741; *see also, e.g.*, R.129, PageID3996 (Petty testifying from a "public health standpoint"); R.129-1, PageID4023 (same from a "health and safety standpoint" regarding public health maxim to avoid "potential harm"); PageID4080 (Petty: "The standard of care requires sort of a transparent, unvarnished transfer of information to the

41

public, as a whole").  This supplants the reasonably prudent Ohio standard with the "low threshold" of proof that this Court warned about in *Tamraz*, 620 F.3d at 673.

The *Welding Fume* court (that this Court reversed in *Tamraz* for *admitting* speculative testimony) repeatedly *rejected* attempts to present "inadmissible personal value judgments regarding the defendants' corporate conduct" as expert testimony in the guise of the precautionary principle.  *Welding Fume*, 2010 U.S. Dist. LEXIS 146067, *146.  It explained that "the critical question for the jury in this case is whether the defendant corporations did what the law *required* them to do, not whether, from a societal perspective, they did what an 'ethical corporation' *should have done*."  *In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164, *86 (N.D. Ohio Aug. 8, 2005).  Experts that present a "standard in excess of what the law requires" will inevitably "confuse the jury."  *Id*. at *87.

The jury here was certainly confused by a public ethics "standard" concocted for litigation "based on the totality of the entire literature in the field of occupational health and environmental health and public health."  Trial Tr., R.157-1, PageID7971.  Dr. Siegel testified that the "duty of care" permits "a range of responses that a company can take," Trial Tr. R.155-2, PageID7558, and that a company was not required to reveal "every chemical that you're emitting," *id.*, PageID 7533, yet at trial, he served as the ultimate arbiter of which responses were appropriate.  He deemed DuPont's actions with respect to its employees consistent

42

with a "reasonable duty of care," but opined that DuPont "fell short, where they violated the duty of care, was that they didn't show the same amount of concern for the community members who might be exposed." Trial Tr., R.155-1, PageID7495-96. Distilling the "duty of care," these experts concluded that companies are obligated to notify the public of potential chemical exposure, regardless of the requirements of Ohio law. *Id.*, PageID7486 ("duty of care" means "the responsibility to inform the community of the fact that C-8 was found in the drinking water"). Likelihood of harm is irrelevant, according to Dr. Siegel, because the "duty" arises with just the *potential* of harm. Trial Tr., R.156-1, PageID7743-44, R.156-2, PageID7832. Consistent with *Daubert* and Ohio negligence law, the district court should have excluded this subjective guesswork.

### B. Dr. Siegel Improperly Couched His Testimony in Legal Parlance and Offered Legal Conclusions.

The district court exacerbated the prejudice from such testimony by allowing Dr. Siegel to invoke legal terminology in his opinions, such as "standard" and "the duty of care." When experts testify on legal standards, they "invad[e] the province of the court to determine the applicable law and instruct the jury as to that law." *Torres v. County of Oakland*, 758 F.2d 147, 150-51 (6th Cir. 1985); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) ("It is the responsibility of the court, not testifying witnesses, to define legal terms."). Opinions that DuPont violated legal standards improperly "substitute the expert's judgment for the

43

jury's." *Nimely*, 414 F.3d at 397; *Torres*, 758 F.2d at 150.  In *Berry*, 25 F.3d 1353-54, this Court reversed after an expert told "the jury what result to reach" by articulating the relevant legal standard and testifying that the defendant breached the standard.

That is exactly what Dr. Siegel did by setting out inapplicable duties of care and then testifying that DuPont violated them more than twenty times during trial.  *See* Trial Tr., R.155, PageID7438 ("DuPont violated the standard of duty" by not "telling the public"), 7552 ("I don't believe that DuPont followed that duty of care."), 7585 (DuPont "violated the duty of care"), 7556 ("the company did not follow the duty of care, the public health duty of care."), 7570, 7580, 7585, 7589; R.156-1, PageID7706-07 (DuPont violated "its duty of care … [by] failing to disclose to the public").  This echoed what the jury was asked to decide – whether "DuPont breached its duty of care," but used the wrong standard.   Jury Instructions, R.140-1, PageID6251.

Dr. Siegel's mantra that "DuPont violated the duty of care" seared this idea in the jury's mind.  As this Court has explained, testimony "which attempts to tell the jury what result to reach and which runs the risk of interfering with a district court's jury instructions [can] hardly can be viewed as being helpful to the jury." *Woods v. Lecureux*, 110 F.3d 1215, 1220-21 (6th Cir. 1997).  To prevent misleading the jury, expert testimony must be excluded where "terms" used by an

expert – such as the duty of care – have a "meaning in the law different" from the expert's meaning. *Torres*, 758 F.2d at 150-51; *United States v. Barile*, 286 F.3d 749, 760-761 (4th Cir. 2002) (same); *In re Sealed Case*, 67 F.3d 965, 969-70 (D.C. Cir. 1995) (same).

The court below recently appeared to appreciate its error. For the *Bartlett* trial, it allowed Dr. Siegel to testify about public health "standards of care" and "to compare DuPont's compliance with … those standards." Order, MDL4129, PageID78653. But just recently, the court explained that "legal" terms that "popped up in the [*Bartlett*] trial," such as "duty of care, negligence, breach" are not "words the witnesses should be using" because they "are conclusions that the jury either does or doesn't draw." Hearing Tr., MDL4527, PageID98349-50. DuPont agrees, and this Court should remand for a new trial because the foundation of Plaintiff's case rested on improper expert testimony couched in legal terminology.

## III. The District Court Applied The Wrong Standard For Negligent Infliction Of Emotional Distress.

The district court also erred by allowing Mrs. Bartlett to make a duplicative claim for negligent infliction of emotional distress ("NIED") and by rejecting Ohio law that a standalone NIED claim requires proof of "severe and debilitating" distress. If the NIED claim resulted from her kidney cancer, as the district court held, then it is duplicative of the negligence claim and could not be pursued as a

45

separate claim.  If the claim was *not* linked to her kidney cancer, then it failed as a standalone claim because Mrs. Bartlett did not prove "severe and debilitating" distress.  Either way, judgment should have been entered for DuPont.

The court shifted course several times on these issues.  Initially, in the context of Mrs. Bartlett's claim for *intentional* infliction of emotional distress, it held that she adduced no evidence of "severe and debilitating" distress.  Order, MDL4211, PageID81262.  Later appreciating that ruling conflicted with her NIED claim, the court *sua sponte* amended its opinion and found the standard satisfied.  Order, MDL4234, PageID81763.  The court later held that Mrs. Bartlett did not need to satisfy that high standard at all because her NIED claim stemmed from a physical injury.  Order, R.161, PageID8252-53, 8338, 8343.  In a subsequent decision in the MDL, however, the court reversed course again, appreciating that Ohio does not allow standalone NIED claims tied to a physical injury, and holding that any distress claimed would be part of the damages in the plaintiff's negligence claim.  Order, MDL4458, PageID96011.

As this patchwork of rulings illustrate, the district court did not faithfully apply Ohio law when finding that Mrs. Bartlett did not have to prove "severe and debilitating" distress to support her standalone NIED claim.  On *de novo* review, this Court should enter judgment for DuPont on this claim or, in the alternative, remand for a new trial under the governing Ohio NIED standard.

## A.   Ohio Law Requires Severe And Debilitating Emotional Distress To Establish A Standalone Claim For NIED.

Mrs. Bartlett asserted both a traditional negligence claim seeking pain and suffering damages for her kidney cancer *and* a standalone NIED claim.  Ohio law does not recognize a standalone claim for NIED without proof of an "emotional injury which is both *severe and debilitating*." *Paugh v. Hanks*, 451 N.E.2d 759, 765 (Ohio 1983) (emphasis added); *Igo v. Coachmen Indus.*, Inc., 938 F.2d 650, 656-57 (6th Cir. 1991) ("Where a plaintiff seeks to recover for emotional or psychiatric injury alone, 'plaintiffs [are] limited to only those which are 'severe and debilitating' to a reasonable person.").  The kind of "severe and debilitating" emotional distress this standard embodies includes "traumatically induced neurosis, psychosis, chronic depression, or phobia."  *Paugh*, 451 N.E.2d at 765.

Dressing the claim up as one for "cancerphobia" offers no exception to the severe and debilitating requirement.  *See, e.g.*, *Coffman v. Dep't of Rehab. & Corr.*, 2013 Ohio App. LEXIS 3995, *5 (Sept. 5, 2013) (affirming dismissal of NIED cancerphobia claim where complaint failed to allege severe and debilitating distress); *Brown v. Ohio Dep't of Rehab. & Corr.*, 2013 Ohio App. LEXIS 4186, *4-5 (Sept. 17, 2013) (same).  This high bar stems from the fact that "[v]irtually everyone has some greater or lesser fear of getting cancer, but the fear does not so disrupt the person's life as to be the basis for negligent infliction of emotional distress."  *Perry v. Dep't of Rehab. & Corr.*, 2013 Ohio App. LEXIS 3992, *6

(Sept. 5, 2013). Because Mrs. Bartlett sought to recover for her fear of a new cancer, *see* Trial Tr., R.145, PageID6369, 6479-80, she was required prove "severe and debilitating" emotional distress.

In holding Mrs. Bartlett to a lesser standard, the district court portrayed this case as consistent with *Binns v. Fredendall*, 513 N.E.2d 278 (Ohio 1987). It concluded that her distress over contracting cancer in the future arose from physical injury (her kidney cancer), obviating the need for "severe and debilitating" distress. Order, R.161, PageID8343 (citing *Binns*, 513 N.E.2d at 280). Contrary to the court's reading, *Binns* does not permit a standalone NIED claim without proof of "severe and debilitating" emotional distress where there is physical injury. *Binns* dealt with a traditional negligence claim, not a standalone claim for NIED, and holds that negligence is the proper vehicle for a plaintiff claiming emotional distress resulting from a negligent act that also caused physical injury. 513 N.E.2d at 279.

Reinforcing the point, the Ohio Supreme Court subsequently held in *Loudin v. Radiology & Imaging Servs.*, 948 N.E.2d 944, syllabus (Ohio 2011) that "emotional distress stemming directly from a physical injury is ***not a basis for an independent cause of action*** for the negligent infliction of emotional distress." (Emphasis added). It affirmed that "a negligence claim involving a physical injury invokes the traditional rules of recovery, which consider emotional distress as part

48

of damages." *Id.* at 949.  A contrary rule would invite double recovery by enabling the jury to twice award damages for the same injury. *See Digiannantoni v. Dillon*, 1996 Ohio App. LEXIS 2542, *13-14 (June 20, 1996) (granting new trial based on such a "double recovery").

The district court now agrees with this position, holding in another of the MDL cases that claims of cancerphobia "do not state an independent claim for NIED" but must be "compensated as a portion of damages in [a] negligence claim." Order, MDL4458, PageID96011.  This recent ruling further illustrates the need for reversal.

### B.   Mrs. Bartlett Failed to Present Sufficient Evidence in Support of Her NIED Claim.

Viewed under the proper standard, Mrs. Bartlett failed to establish that her distress arose to the requisite "severe and debilitating" level, or that that she "was unable to cope." *Paugh*, 451 N.E.2d at 765.  She failed to elicit any evidence that she "sought medical or psychiatric help or was unable to work or otherwise function in [her] daily life." *Miller v. City of Columbus*, 920 F. Supp. 807, 824 (S.D. Ohio 1996).  Ohio law requires a plaintiff to "at least provide some evidence beyond his or her own testimony" to prove claimed emotional distress. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1111 (6th Cir. 2008).  But Mrs. Bartlett did not call any expert to testify as to her emotional distress.  To the contrary, her physician, Dr. Bahnson, testified that he could not recall her even

complaining about (let alone seeking treatment for) emotional distress, Trial Tr., R.128, PageID3878, underscoring her failure to prove an "anxiety-related psychiatric diagnosis." *Igo*, 938 F.2d at 657.

Applying the Ohio NIED standard, this Court reversed a verdict for emotional distress where plaintiffs proved "only 'some anxiety symptoms,' but no anxiety-related psychiatric diagnosis," and plaintiffs "did not seek or receive treatment for emotional harm." *Id.* at 656-57. Likewise, this Court affirmed dismissal of a NIED claim where the plaintiff "never consulted either medical or psychological experts for assistance, and she never missed work." *Gagne v. Nw. Nat'l Ins. Co.*, 881 F.2d 309, 317-18 (6th Cir. 1989); *see also Talley*, 542 F.3d at 1111 (evidence that plaintiff "finds it difficult to get out of bed" and "cries frequently and otherwise appears to be depressed" is insufficient); *Lynn v. Allied Corp.*, 536 N.E.2d 25, 35 (Ohio App. 1987) ("distraught and hysterical" feelings insufficient to prove NIED).

In short, there is *no* evidence that Mrs. Bartlett suffered from severe and debilitating emotional distress as required under Ohio law. Even the district court initially agreed with this conclusion, holding (for her claim for intentional infliction of emotional distress) that "the evidence fails to constitute severe and debilitating injury under Ohio law." Order, MDL4211, PageID81262. Later recognizing the inconsistency with its holding allowing the NIED claim to proceed

to trial, the court *sua sponte* modified its holding. Order, MDL4234, PageID81763. But that cannot create evidence where none exists, and Mrs. Bartlett never adduced any evidence of "severe and debilitating" distress. Judgement should therefore be entered for DuPont on Mrs. Bartlett's NIED claim.

### C.    In the Alternative, This Court Should Grant DuPont A New Trial on the NIED Claim.

In the alternative, a new trial is required as the jury was instructed only that Mrs. Bartlett must have suffered "serious emotional distress" rather than distress that is "severe and debilitating." Jury Instructions, R.139, PageID6211 (allowing for recovery for NIED for "the increased fear of developing cancer" and a "reasonable apprehension which manifests itself as emotional distress"). This falls far below the "severe and debilitating" standard that Ohio law requires, as described above, necessitating a new trial on Mrs. Bartlett's NIED claim.

### IV.    The District Court Erred By Refusing To Apply Ohio's Tort Reform Act.

This Court should reverse the district court's refusal to apply the damages cap in Ohio Rev. Code § 2315.18(B)(2).[4] Order, MDL4215, PageID81287. Passed as part of the Ohio Tort Reform Act and effective in April 2005, Section 2315.18(B)(2) limits noneconomic damages to $250,000 in cases (like this one)

---

[4] If the Court agrees with some or all of the arguments above, it would remand for a new trial, clarifying that the Tort Reform Act applies. If it does not grant a new trial, it would still remand for application of the Act to the jury's verdict, reducing the total damages to $250,000.

without an award of economic damages. This is a matter of "statutory interpretation [that] is a question of law requiring de novo review." *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011). The trial court erred in two ways by refusing to apply the damages cap.

First, deepening a split between Ohio federal courts, the court held that the Ohio Tort Reform Act applies only to *injuries that occur* after its effective date, rather than to *claims that accrue* after that date. Order, MDL4215, PageID81292-96. This is contrary to Ohio Supreme Court and statutory authority on accrual. Second, the court held that allegations in the *Leach* class action triggered the accrual of Mrs. Bartlett's claims, even though she was unaware of both C8 and the litigation. *Id.*, PageID81296-97. This lawsuit-based accrual standard not only ignores Ohio law, but creates an unmanageable burden for potential plaintiffs.

## A.   Section 2315.18(B)(2) Of The Tort Reform Act Applies To Claims That Accrue After April 2005.

The trial court erred by disregarding Ohio precedent to hold that the Ohio Tort Reform Act applies only to injuries that occur after its effective date. Order, MDL4215, PageID81292. The Ohio Supreme Court has repeatedly held that new legislation applies prospectively to all claims that accrue after the legislation's effective date. *Digital & Analog Design Corp. v. N. Supply Co.*, 590 N.E.2d 737, 743 (Ohio 1992) (legislation applies to "causes of action arising on or after … the effective date"); *Thorton v. Montville Plastics & Rubber, Inc.*, 902 N.E.2d 482,

486 (Ohio 2009) (date the claim arose determines which statute applies); *see also Chesher v. Neyer*, 477 F.3d 784, 794 (6th Cir. 2007) (applying statute "to claims accruing after the effective date of the amendment").

Ohio cases thus emphasize that the *accrual* date controls the analysis, not the date of the injury or negligence. *Ross v. Farmers Ins. Group of Cos*., 1997 Ohio App. LEXIS 30, *8-9 (Jan. 10, 1997) ("the operative date for determining whether to apply 'former R.C. 3937.18' or the Savoie amendment ... is not the accident date but the [accrual] date"); *Treese v. City of Delaware*, 642 N.E.2d 1147, 1151 (Ohio App. 1994) ("In this case, the cause of action accrued after the effective date ... even though the alleged negligence occurred before the effective date.").

In addition, Ohio incorporated the discovery rule directly into accrual for toxic torts, meaning that "a cause of action does not arise until the plaintiff discovers, or ... should have discovered, that he or she was injured by the wrongful conduct." *Norgard v. Brush Wellman*, 766 N.E.2d 977, 979 (Ohio 2002). The Ohio legislature adopted this rule in Section 2305.10(B)(1) for claims of "exposure to hazardous or toxic chemicals," like Mrs. Bartlett's claims. When interpreting the predecessor to this statute, the Ohio Supreme Court held that "the terms 'arose' and 'accrued' are synonymous." *Browning v. Burt*, 613 N.E.2d 993, 1004 (Ohio 1993). Because Mrs. Bartlett's claims arose after April 2005, as shown below, the damages cap applies.

53

Following one of two conflicting lines of Ohio federal cases, the court below held that the discovery rule applies to accrual when considering the statute of limitations, but does *not* apply to accrual for purposes of "whether the Ohio Tort Reform Act applies to a cause of action."  Order, MDL4215, PageID81294-95.  To support these two different calculations of the date Mrs. Bartlett's claim accrued, the court relied on cases *outside Ohio* holding that a claim "arises" when an injury occurs but only "accrues" when the plaintiff learns who is at fault.  *Id*.  The court never explains why it follows those foreign cases, particularly when the only state court case it cites, *Blair v. McDonagh*, 894 N.E.2d 377, 391-92 (Ohio 2008), applied the "versions of the statute in effect during the time when the claims accrued."  In fact, *Blair* rejected an argument that the date of the misconduct controlled, focusing instead on when the claims "arose."  *Id*.  Commentators have criticized the district court's decision on this issue because it "cites nowhere to Ohio law and provides little reasoning for its conclusion." 1-17 Anderson's Ohio Consumer Law §17.03 n.30.

Other Ohio federal courts explicitly disagree with the reasoning of the court below (and its line of cases), explaining that such decisions "make a flawed distinction between when a claim *arises* and when it *accrues*" and that "regardless of when the injury occurred, it is the date on which the claim accrued … that matters."  *Hempy v. Breg*, *Inc.*, 2012 U.S. Dist. LEXIS 14947, *6-7 (S.D. Ohio

Feb. 6, 2012) (emphasis in original); *Musgrave v. Breg, Inc.*, 2011 U.S. Dist. LEXIS 128101, *11 (S.D. Ohio Nov. 4, 2011) (same); *Stratford v. SmithKline Beecham Corp.*, 2008 U.S. Dist. LEXIS 84826, *12 (S.D. Ohio June 17, 2008) (asking if "the cause of action accrued after the effective date").

The *Hempy* line of cases accurately reflects Ohio law.  *See* 1-17 Anderson's Ohio Consumer Law § 17.03 (noting that *Hempy* "is correct" and explaining that contrary opinions "lack thorough analysis").  As explained above, the Ohio Supreme Court has instructed that: (1) new legislation applies prospectively to all causes of action that accrue after the effective date, *Digital & Analog Design*, 590 N.E.2d at 743; (2) the discovery rule determines the accrual date for a chemical exposure claim like Mrs. Bartlett's, Ohio Rev. Code § 2305.10(B)(1); and (3) "the terms 'arose' and 'accrued' are synonymous," *Browning*, 613 N.E.2d at 1004. Instead of following Ohio law as explained by Ohio's highest court, the trial court generated unnecessary confusion by holding that the same claim will accrue at different times for different purposes.

### B.    The Damages Cap Applies Because Mrs. Bartlett's Claims Did Not Accrue Until After April 2005.

The district court also erred by holding that Mrs. Bartlett's claim accrued before 2005 based on the publication of a class notice in the *Leach* litigation, even though Mrs. Bartlett never saw the notice and never knew about the lawsuit.  The Ohio accrual statute, Section 2305.10(B)(1), requires an *individual* inquiry about

55

when she knew, or should have known, that her kidney cancer related to C8 exposure caused by DuPont. *Norgard*, 766 N.E.2d at 979. Because Mrs. Bartlett had no reason to suspect this until after April 2005, the damages cap applies.

It is undisputed that Mrs. Bartlett had not even heard of C8 until she was tested for exposure during C8 testing in October 2005. Trial Tr., R.131-1, PageID4588-89; Washburn Expert Report, MDL2807-8, PageID42884. Mrs. Bartlett also testified that she did not learn that C8 might cause cancer until 2012. Trial Tr., R.131-1, PageID4589-90. And Plaintiff's expert acknowledged that no publicly-available toxicology or epidemiology study showed any association between C8 and kidney cancer at community levels of exposure before 2012. Trial Tr., R.128-2, PageID3879. The EPA agreed in 2009 that "studies of exposure to [C8] and adverse health outcomes in humans are inconclusive at present." Rickard Expert Report, MDL2807-4, PageID42522-23. On these facts, no reasonable person in Mrs. Bartlett's position could have known she had a claim against DuPont before April 2005.

Instead of an individual inquiry, the district court made a blanket decision that publication of the *Leach* class notice meant – as a matter of law – that any diligent person in Mrs. Bartlett's position would have known "before April 7, 2005 that her injury was related to her exposure to C-8." Order, MDL4215, PageID81296-97. This holding was in error for three reasons:

First, the district court imputed to Mrs. Bartlett knowledge about the class action in the absence of any evidence that she received the class notice. Order, MDL4215, PageID81296-97. The Ohio Supreme Court refuses to impute knowledge that the individuals themselves did not have a chance to learn. For example, *Liddell v. SCA Servs.*, 635 N.E.2d 1233, 1239 (Ohio 1994), held that a claim did not accrue until the plaintiff learned that "the cancerous growth in his nasal cavity might be linked to his exposure to toxic chlorine gas." And *Norgard*, 766 N.E.2d 979-81, held that a claim did not accrue until the plaintiff learned the facts of his employer's wrongdoing, even though he knew his sickness was employment-related and that other employees had sued his employer.

These cases apply the maxim that "[t]he focus of the [discovery] rule is upon the knowledge and actions of individuals." *Breedlove v. Ohio DOT*, 598 N.E.2d 242, 253 (Ohio Ct. Cl. 1991); *Elam v. Dhananjai Menzies*, 594 F.3d 463, 471 (6th Cir. 2010) (although advertisements "arguably informed Elam of a potential products liability action against the manufacturer," they did not "inform Elam that Dr. Menzies negligently placed his stents"). The district court erred by calculating the accrual date based on knowledge that Mrs. Bartlett did not have.

Second, the court erred by holding that allegations about C8 triggered accrual for anyone who had kidney cancer. Facts, not allegations, prompt accrual: "It is therefore the knowledge, actual or inferable, of *facts*, not legal theories,

which initiates the running of the … statute of limitations." *Hershberger v. Akron City Hospital*, 516 N.E.2d 204, 207 (Ohio 1987) (emphasis in original); *Myles v. Johns-Manville Sales Corp.*, 459 N.E.2d 620, 622 (Ohio Ct. App. 1983) (holding that "exposure-related diseases" are only "discovered … after a causal relation is established between his medical problems and his previous exposure"). The newspaper class notices do not mention cancer at all, and the full-form notice (which Mrs. Bartlett did not receive) only mentions that the Science Panel will study "whether" a probable link exists. Class Notice, MDL820-11, PageID11855. Ohio law requires a connection between DuPont's conduct, C8, and Mrs. Bartlett's specific disease before her claims could begin to accrue.

Third, if upheld, the district court's novel decision that allegations begin accrual would bar legitimate claims and create perverse incentives. As explained in *Nelson v. Indevus Pharms., Inc.*, 142 Cal. App. 4th 1202, 1206 (2006), public dialog about potential hazards cannot be attributed to someone unaware of the discussion. *Nelson* held that "[t]he statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only '[o]nce the *plaintiff* has a suspicion of wrongdoing.'" *Id.* (citation omitted) (emphasis added). Consistent with Ohio law, it explained that "the law only requires an investigation when a plaintiff has a reason to investigate." *Id.* at 1208. As the Ohio Supreme Court explained (in a different context): "The [discovery]

rule entails a two-pronged test—i.e., actual knowledge not just that one has been injured but also that the injury was caused by the conduct of the defendant." *Flagstar Bank, F.S.B. v. Airline Union's Mortg. Co*., 947 N.E.2d 672, 676 (Ohio 2011).

If a lawsuit by a third party triggered the accrual of claims for people with no actual knowledge of that lawsuit, many people would forfeit their claims before having any chance to even learn about them. The trial court's artificially early accrual date for Mrs. Bartlett's claims defies Ohio law and common sense.

## **CONCLUSION**

For the foregoing reasons, this Court should reverse and remand for a new trial on the negligence claim (clarifying that the Tort Reform Act applies) and entry of judgment in DuPont's favor on the NIED claim. In the alternative, it should remand for application of the Tort Reform Act to the jury's verdict.

Respectfully submitted,

/s/Pierre H. Bergeron

Damond R. Mace
Stephen M. Fazio
Bruce A. Khula
Squire Patton Boggs (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8500
Fax: (216) 479-8780
damond.mace@squirepb.com

Pierre  H. Bergeron
Colter L. Paulson
Lauren S. Kuley
Squire Patton Boggs (US) LLP
221 E. Fourth Street, Suite 2900
Cincinnati, Ohio 45202
Telephone:  (513) 361-1200
Fax:  (513) 361-1201
pierre.bergeron@squirepb.com

*Attorneys for Appellant E. I. du Pont de Nemours and Company*

## DESIGNATION OF DISTRICT COURT DOCUMENTS

**From the *Bartlett* case:**

| Doc No. | PageID# | Description |
|---------|---------|-------------|
| 5 | 64-66 | Amended Complaint |
| 128 | 3781-82, 3876-78 | Trial Transcript for September 22, 2015 |
| 128-1 | 3805-08, 3823-24 | Trial Transcript for September 22, 2015 |
| 128-2 | 3872, 3875-76, 3879 | Trial Transcript for September 22, 2015 |
| 129 | 3971, 3973, 3996, 4009, 4016 | Trial Transcript for September 23, 2015 |
| 129-1 | 4023, 4076, 4079-80, 4091 | Trial Transcript for September 23, 2015 |
| 130-2 | 4466 | Trial Transcript for September 28, 2015 |
| 131 | 4606-13 | Trial Transcript for September 24, 2015 |
| 131-1 | 4588-90 | Trial Transcript for September 24, 2015 |
| 133 | 5273 | Trial Transcript for September 30, 2015 |
| 135 | 5354-55, 5376-77 | Sealed Trial Transcript for October 1, 2015 |
| 139 | 6211 | Final Jury Instructions |
| 140-1 | 6229, 6251-53 | Jury Instructions |
| 144 | 6285 | Civil Judgment |
| 145 | 6362-69, 6479-80 | Trial Transcript for October 6, 2015 |
| 146 | 6496 | Trial Transcript for October 7, 2015 |

| 147 | 6514-15 | Trial Transcript for September 14, 2015 |
| 154 | 7164, 7221-27 | Trial Transcript for September 15, 2015 |
| 154-1 | 7283 | Trial Transcript for September 15, 2015 |
| 155 | 7438 | Trial Transcript for September 16, 2015 |
| 155-1 | 7445, 7486, 7517 | Trial Transcript for September 16, 2015 |
| 155-2 | 7551-53, 7556, 7573, 7580, 7585, 7589 | Trial Transcript for September 16, 2015 |
| 156-1 | 7705-07, 7718, 7741, 7743-44, 7762-65 | Trial Transcript for September 17, 2015 |
| 156-2 | 7832 | Trial Transcript for September 17, 2015 |
| 157 | 7929 | Trial Transcript for September 18, 2015 |
| 157-1 | 7970-71, 8031-32 | Trial Transcript for September 18, 2015 |
| 157-2 | 8046 | Trial Transcript for September 18, 2015 |
| 161 | 8228, 8262, 8268, 8273, 8343 | Dispositive Motions Order No. 12 |
| 162 | 8353 | Notice of Appeal |

**From the MDL:**

| 820-9 | 11833-47 | Order in *Leach v. E. I. Du Pont De Nemours & Co.* |
| 820-11 | 11855 | Class Notice in *Leach v. E. I. Du Pont De Nemours & Co.* |
| 1679 | 22985 | Dispositive Motions Order No. 1 |
| | | Cohen Expert Report for DuPont |

| 2807-1 | 42159-60, 42171, 42174-76 | |
| 2807-4 | 42520-24, 42529-34, 42537-40 | Rickard Expert Report for DuPont |
| 2807-8 | 42869, 42884 | Washburn Expert Report for DuPont |
| 2807-9 | 42979 | Weed Expert Report for DuPont |
| 2813-1 | 45944 | DuPont's Overview Brief on Causation Issues |
| 2813-4 | 46010, 46014, 46017-21 | Science Panel Report |
| 2813-5 | 46024-27 | Scientific Study attached to DuPont's Overview Brief on Causation Issues |
| 2823-1 | 46913-14 | Bilott Letter attached to DuPont's Motion to Exclude Testimony of Specific Causation Experts |
| 3066-1 | 49866-67 | Margulis Deposition |
| 3972 | 68165, 68167, 68171-74 | Dispositive Motions Order No. 1-A |
| 4079 | 71854-56, 71861, 71863, 71866, 71869-70 | Evidentiary Motions Order No. 1 |
| 4129 | 78653, 78657 | Evidentiary Motions Order No. 2 |
| 4183 | 80074 | Case Management Order No. 10 |
| 4211 | 81262 | Dispositive Motions Order No. 9 |
| 4215 | 81287, 81292-97 | Dispositive Motions Order No. 10 |
| 4226 | 81632-37 | Evidentiary Motions Order No. 1-A |
| 4228-2 | 81679 | Flaherty Deposition |
| 4234 | 81763 | Dispositive Motions Order No. 9-A |

| 4274 | 85040 | Pretrial Order No. 41 |
|------|-------|-----------------------|
| 4306 | 89499, 89508, 89544 | Dispositive Motions Order No. 12 |
| 4352 | 93249 | Dispositive Motions Order No. 13 |
| 4458 | 96011 | Dispositive Motions Order No. 14 |
| 4519 | 98003 | Dispositive Motions Order No. 15 |
| 4527 | 98349-50 | Transcript of Final Pretrial Conference |

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief is written in a proportionately spaced, 14-point Times New Roman font, and contains 13,895 words, exclusive of the material not counted under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

/s/ Pierre H. Bergeron
Pierre H. Bergeron

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2016, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Pierre H. Bergeron
Pierre H. Bergeron