No. 16-3310

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

In re: E. I. DU PONT DE NEMOURS AND COMPANY
C-8 PERSONAL INJURY LITIGATION

CARLA MARIE BARTLETT

*Plaintiff-Appellee*,

v.

E. I. DU PONT DE NEMOURS AND COMPANY

*Defendant-Appellant*.

On appeal from the United States District Court
for the Southern District of Ohio, Western Division
Civil Cases Nos. 2:13-CV-00170; 2:13-md-02433

## MERIT BRIEF OF PLAINTIFF-APPELLEE

Robert A. Bilott
John B. Nalbandian
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Telephone: 513-381-2838
Facsimile: 513-381-0205
bilott@taftlaw.com
nalbandian@taftlaw.com

David J. Butler
Taft Stettinius & Hollister LLP
65 East State Street, Suite 1000
Columbus, OH  43215-4213
Telephone:  (614) 221-2838
Facsimile:  (614) 221-2007
dbutler@taftlaw.com

Kevin J. Madonna
Kennedy & Madonna, LLP
48 Dewitt Mills Rd.
Hurley, NY  12443
Telephone:  845-481-2622
Facsimile:  845-230-3111
kmadonna@kennedymadonna.com


*Counsel for Plaintiff-Appellee*
*Carla Marie Bartlett*

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Under 6th Cir. Rule 26.1, Plaintiff-Appellee makes the following disclosures:

1.   Are any parties a subsidiary or affiliate of a publicly owned
     corporation?

     **NO**.

2.   Is there a publicly owned corporation, not a party to the appeal, that
     has a financial interest in the outcome?

     **NO**.


Dated: July 28, 2016

                                        */s/ John B. Nalbandian*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...................................... vi

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .......................... 1

STATEMENT OF THE CASE ............................................................ 2

    A.  DuPont's Washington Works Plant ............................................. 3

    B.  The *Leach* Litigation And Resulting Class Action Settlement ..................... 6

    C.  The District Court Litigation ..................................................... 15

SUMMARY OF THE ARGUMENT .................................................... 16

ARGUMENT .......................................................................... 19

I.    The District Court Did Not Erroneously Enforce The Terms Of The
Parties' Agreement. .................................................................. 19

    A.  The District Court Properly Applied The Phrase "Among Class
Members" Consistent With The Plain Language And Intent Of
The Agreement. .................................................................. 22

    B.  Dupont Improperly Attempts To Rely On A Definition Of General
Causation That Is Not Included In The Agreement. ........................... 24

    C.  The District Court Properly Allowed Evidence Relating To Specific
Causation. ....................................................................... 28

II.    The Trial Court Did Not Err In Permitting The Testimony Of
Mrs. Bartlett's Experts. .............................................................. 34

    A.  Mrs. Bartlett's Experts Did Not Create And Invoke An Erroneous
Duty Of Care. ................................................................... 35

    B.  Dr. Siegel's Testimony Was Proper Because It Did Not Offer
Legal Conclusions. .............................................................. 41

        1.  Dr. Siegel offered testimony that assisted the jury. He did
not merely tell the jury what result to reach. ............................... 41

        2.  If an error occurred, it was harmless. ..................................... 44

i

III.   This Court Should Affirm The Jury's Damages Award For
       Negligent Infliction Of Emotional Distress. ................................................ 45

IV.    The District Court Properly Concluded That Ohio's Tort Reform
       Act Of 2004 Did Not Apply To Mrs. Bartlett's Case. ................................. 52

       A.   Application Of Ohio's Tort Reform Act Would Be Impermissibly
            Retroactive. ............................................................................................... 52

       B.   Mrs. Bartlett's Claims Accrued Prior To The Effective Date Of
            The Tort Reform Act. ............................................................................... 57

CONCLUSION ................................................................................................. 60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*,
611 N.E.2d 955 (Ohio Ct. App 1992) ................................................................. 54

*Binns v. Fredendall*,
513 N.E.2d 278 (Ohio 1987) ....................................................................... 46, 47

*Blair v. McDonagh*,
894 N.E.2d 377 (Ohio Ct. App. 2008) ......................................................... 53, 54

*Browning v. Burt*,
613 N.E.2d 993 (Ohio 1993) ........................................................................... 55

*Cacciacarne v. G.D. Searle & Co.*,
908 F.2d 95 (6th Cir. 1990) .............................................................................. 58

*Cantrell v. GAF Corp.*,
999 F.2d 1007 (6th Cir. 1993) .......................................................................... 46

*CFE Racing Prods., Inc. v. BMF Wheels, Inc.*,
793 F.3d 571 (6th Cir. 2015) ........................................................................... 44

*Davis v. Combustion Eng'g, Inc.*,
742 F.2d 916 (6th Cir. 1984) ........................................................................... 44

*Dukes v. Ohio Dep't of Job & Family Servs.*,
No. 09AP-515, 2009 WL 4932723 (Ohio Ct. App. Dec. 22, 2009) ................... 53

*Flowers v. Walker*,
589 N.E.2d 1284 (Ohio 1992) .......................................................................... 58

*Great West Cas. Co. v. P.A.M. Transp.*,
613 Fed. Appx. 509 (6th Cir. 2015) ................................................................. 49

*Heffelfinger v. Connolly*,
2009 WL 112792  (N.D. Ohio Jan. 15, 2009) ............................................. 53, 54

*Hughes v. Vanderbilt Univ.*,
  215 F.3d 543 (6th Cir. 2000)............................................................................ 58

*In re Andrew*,
  895 N.E. 2d 166 (Ohio 2008)......................................................................... 56

*In re Scrap Metal Antitrust Litig.*,
  527 F.3d 517 (6th Cir. 2008).............................................................35, 38, 41

*In re: Welding Fume Prods. Liab. Litig.*,
  2010 U.S. Dist. LEXIS 146067 (N.D. Ohio June 4, 2010) ................................ 39

*Lavelle v. Owens-Corning Fiberglass Corp.*,
  507 N.E.2d 476 (Ohio C.P. 1987) ...............................................................47, 50

*Leach v. E. I. du Pont de Nemours & Co.*,
  No. 01-C-698 (Wood Cty. W. Va. Cir. Ct.)..................................................passim

*Lidell v. SCA Servs. of Ohio, Inc.*,
  635 N.E.2d 1233 (Ohio 1994)....................................................................57, 58, 59

*Loudin Radiology & Imaging Servs.*,
  924 N.E.2d 433 (Ohio Ct. App. 2009)............................................................. 46

*McLean v. 988011 Ontario, Ltd.*,
  224 F.3d 797  (6th Cir. 2000)........................................................................ 41

*Mussivand v. David*,
  544 N.E.2d 265 (Ohio 1989).......................................................................... 40

*Paugh v. Hanks*,
  451 N.E.2d 759 (Ohio 1983)......................................................................46, 50

*Rhodes v. DuPont*,
  253 F.R.D. 365 (S.D.W.Va. 2008) ................................................................. 26

*Scottsdale Ins. Co. v. Flowers*,
  513 F.3d 546 (6th Cir. 2008)......................................................................... 45

iv

*Sorenson v. Tenuta*,
62 Ohio App.3d 696 (1989) .............................................................. 53

*State v. Everette*,
951 N.E.2d 1018 (Ohio 2011) ........................................................... 56

*Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*,
272 F.3d 441 (7th Cir. 2001) ............................................................ 49

*Tamraz v. Lincoln Elec. Co.*,
620 F.3d 665 (6th Cir. 2010) ........................................................ 40, 41

*Taylor v. Streicher*,
465 Fed. Appx. 414 (2012) .............................................................. 51

*Torres v. Cty. of Oakland*,
758 F.2d 147 (6th Cir. 1985) ......................................................... 42, 44

*United States v. Marietta Mfg. Co.*,
339 F. Supp. 18  (S.D.W.Va. 1972) ................................................. 20, 21

*United States v. Volkman*,
797 F.3d 377 (6th Cir. 2015) ........................................................... 43

**Statutes**

Ohio Rev. Code § 1.48 ................................................................... 53

Ohio Rev. Code § 2305.10 ...................................................... 55, 56, 57

Ohio Rev. Code § 2305.10(G) ....................................................... 56, 57

Ohio Rev. Code § 2315.18 ................................................. 52, 56, 57, 59

Ohio Rev. Code § 2315.18(B)(2) ....................................................... 53

Ohio Rev. Code § 2315.21 ............................................................... 54

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellee Carla Bartlett ("Mrs. Bartlett") concurs with Defendant-Appellant E. I. du Pont de Nemours and Company ("DuPont") that oral argument would assist the Court in this case.

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.      Whether the trial court properly enforced the terms of a class settlement agreement between the parties to prohibit DuPont from contesting General Causation in a toxic tort case by a member of the class, while still permitting DuPont to contest Specific Causation under the terms of that private contract?

2.      Whether the court properly permitted Mrs. Bartlett's experts to testify about DuPont's duties as part of her negligence case?

3.      Whether a rational juror could have found that Mrs. Bartlett carried her burden of proof to show negligent infliction of emotional distress damages that accompanied her physical injury?

4.      Whether the court properly determined that the Ohio Tort Reform Act does not apply to Mrs. Bartlett's pre-Act case?

## STATEMENT OF THE CASE

After a four-week trial, a jury awarded Mrs. Bartlett $1.6 million in compensatory damages for state-law torts related to kidney cancer caused by DuPont's chemical known as C-8 (also known as PFOA). The evidence showed that DuPont discharged C-8 into the environment even though it knew C-8 was a carcinogen, would contaminate groundwater, and would bio-accumulate in human tissue. DuPont's own scientists raised "ethical and environmental concerns" about C-8 and recommended that it not be discharged into the environment. DuPont disregarded these recommendations – along with the recommendations and advice of its own lawyers - and hid what it knew. The result was the poisoning of drinking water supplies serving approximately 80,000 people in the Mid-Ohio Valley, including Mrs. Bartlett.

Seeking reversal, DuPont distorts the record, ignores the class action context in which this litigation arose, ignores basic law regarding contract interpretation, fails to contend with the evidence presented, and fails to address how its own flawed litigation strategy resulted in the trial rulings that it now complains were in error. Ultimately, DuPont offers no valid reason to conclude that the district court erred in upholding the jury's verdict.

### A.     DuPont's Washington Works Plant

C-8 is a carcinogen that is biopersistent in the environment and bioaccumulates in the body. (R161 DMO12, PageID8243-44.) Beginning in 1951, DuPont discharged the C-8 that caused Mrs. Bartlett's kidney cancer from its Washington Works plant ("Plant") in Parkersburg, WV. DuPont utilized C-8 as an "exotic surfactant" in the manufacturing of Teflon© at the Plant. (*Id.*, PageID8326; MDL4235 DMO11, PageID81770.)

C-8 is a halogenated organic compound. (MDL344-1 Amter Report, PageID59344.) Since the 1940s, it has been known that these compounds can cause extensive and long-lasting groundwater contamination. (*Id.*) DuPont was aware of the dangers associated with C-8 as early as the 1950s and by the 1960s, was specifically aware of its toxicity to animals and its ability to contaminate groundwater. (MDL4235 DMO11, PageID81772.) DuPont internally classified C-8 as an animal carcinogen and possible human carcinogen as early as 1988. (MDL3441-1 Amter Report, PageID59365.)

By the 1980s, DuPont had learned that C-8's unique chemical structure allows it to accumulate and bind with human blood. (*Id.* PageID59357, 59362.) DuPont understood that once in the blood, C-8 remains for years, recirculating and "re-dosing" all of the internal organs and building up to higher levels in the blood with each, however small, additional exposure. (*Id.*)

3

It is undisputed that, for decades, Dupont discharged vast quantities of C-8 into the environment around the Plant resulting in the contamination of area drinking water supplies. In fact, DuPont discharged massive amounts of C-8 into the Ohio River, despite its own internal warnings that C-8 should not be discharged to water, and a 1986 warning by the manufacturer of C-8 (3M Company)[1] that C-8 should only be disposed through incineration or at a proper landfill. Despite these warnings, DuPont continued to release *tens of thousands* of pounds of C-8 directly into surface waters, unlined landfills, and the air, in ever *increasing* amounts, even though proper incineration of C-8 would only have cost less than 0.2 percent of the Plant's $600 million annual operating cost. (MDL4235 DMO11, PageID81770-73.) Indeed, between 1984 and 2000, DuPont *increased* its dumping of C-8 into the environment by a factor of three, even though DuPont could have used a substitute for C-8 as early as 1984. (R161 DMO12, PageID8243.)

DuPont also withheld critical C-8 toxicity and exposure information that might have allowed regulatory agencies to address DuPont's C-8 releases much earlier than they did. (MDL4235 DMO11, PageID81772, 81776.) As a result of its failure to timely supply information to the EPA, including DuPont's own data confirming C-8 in residential drinking water in the community surrounding the

---

[1] Although 3M announced in 2000 that it would no longer make C-8, in part because of C-8's biopersistence, DuPont built its own C-8 manufacturing plant to supply C-8 to Washington Works. (R161 DMO12, PageID8245.)

4

Plant, DuPont eventually paid $16.25 million (the largest civil penalty ever levied by EPA at that time) to settle EPA's claims. (MDL4235 DMO11, PageID81776.)[2]

Evidence at trial demonstrated that DuPont knew, by as early as the 1980s, that its C-8 releases were contaminating local drinking water supplies at levels greater than what its own scientists claimed were safe, yet, purposefully chose not to tell the people drinking that water. (MDL4235 DMO11, PageID81773.) DuPont's C-8 spread into six public water supplies and dozens of private drinking water wells, including the Tuppers Plains-Chester Water District in Ohio ("TPCWD"), contaminating the drinking water and blood of approximately 80,000 people in those communities. Mrs. Bartlett was one of those residents who unwittingly drank the C-8 contaminated water for decades. Mrs. Bartlett first began drinking TPCWD water in the 1980s, (MDL2702-6 MacIntosh Report, PageID41005), and was diagnosed with kidney cancer in 1997. By 2005, when Mrs. Bartlett's blood was first tested for C-8 – and after she had been drinking C-8 contaminated water for over 20 years at concentrations ranging from 0.17 to 0.85 ppb, Mrs. Bartlett had accumulated enough C-8 in her blood to place her in the *99.6 percentile* – meaning only 0.04 percent of those tested for C-8 in the United States had higher levels. (*Id.*, PageID41005-06.)

---

[2] (*See also* MDL4235 DMO11, PageID81770-76 (discussing DuPont's conduct involving C-8 in detail, including citations to evidence presented at trial); MDL3441-1 Amter Report, PageID59332-59400 (same); MDL3441-3 Petty Report, PageID59750-82 (same).)

It was not until after DuPont was sued in the late 1990s and early 2000s for its C-8 contamination that DuPont began incinerating and filtering C-8, and thus finally reducing its C-8 discharges to the environment. (R161 DMO12, PageID8243.) Even then, the total elimination of C-8 previously urged by DuPont's own scientists decades earlier did not actually occur until 2014. (*Id.*)

### B.    The *Leach* Litigation And Resulting Class Action Settlement

In 2001, a class action was filed against DuPont on behalf of thousands of individuals whose drinking water was contaminated with C-8. *Leach v. E. I. du Pont de Nemours & Co.*, No. 01-C-698 (Wood Cty. W. Va. Cir. Ct.) ("*Leach* Case"). In 2002, the West Virginia trial court ("*Leach* Court") certified the case as a class action with respect to "all common fact and legal issues relating to [DuPont's] underlying liability for all claims in this case," including the class members' claims for personal injury, wrongful death, and "liability for punitive damages," and "all fact and legal issues relating to Plaintiffs' claims for equitable, declaratory, and injunctive relief, including medical monitoring" (the "Common Issues"). *Leach*, 2002 WL 1270121, at *18 (April 10, 2002).

After three years of litigation, including three issues taken to the West Virginia Supreme Court of Appeals, the parties reached a class-wide settlement through a settlement agreement ("Agreement") approved by the *Leach* Court in 2005 ("Final Order"). (MDL820-9 Order, PageID11833.) In addition to settlement

terms providing for immediate clean water for the class, the parties also fashioned unique and innovative mechanisms for addressing and resolving class claims related to the impact of C-8 contamination on the class members' health.

At the time of settlement, the parties vigorously disputed the likelihood of adverse health impacts of C-8 among class members.[3] Although DuPont had never disputed that C-8 could be capable of causing harm to humans at *some* level of exposure,[4] DuPont still disputed that the level of C-8 in the drinking water of the actual *Leach class members* was sufficient to cause harm.

Eschewing the uncertainties of a lay jury, the parties jointly agreed to remove the critical, yet common general causation issue from the on-going litigation process and submit the question of whether C-8, *at the level actually present* in the drinking water of the *Leach* Class, is likely to be capable of causing serious disease *among those class members* to a new, *jointly-selected* independent panel of three epidemiologists (the "Science Panel")[5] who would resolve the issue

―――――――――――――――

[4] (MDL820-22, RFAs 147 & 148, PageID11987; MDL820-23 Report, PageID11993; MDL820-25 Mem. PageID12003.)

[5] The parties purposefully chose to populate the Science Panel with three *epidemiologists* because, as DuPont readily admits in its current brief, epidemiologists "focus on *group characteristics* rather than individual causation." (DuPont Br. 22 (emphasis added).) Likewise, the Science Panel confirmed its own understanding that it was "charged with the task of determining whether [C-8] was indeed linked to damage to the health *of the residents of this community*." (MDL1152-4 Article, PageID15730 (emphasis added).)

7

for the whole class according to the specific criteria defined by the parties in their Agreement. The parties further agreed that the Science Panel's independent decision on this general causation issue would be final and binding on the parties with respect to any further litigation between the parties. (MDL820-8 Agreement §§3, 12, PageID11809-11, 11823-28.)[6]

To insure that the Science Panel focused on the capacity of C-8 to be likely to cause adverse health effects to *these* class members at the C-8 levels actually present in that class, the parties charged the Science Panel, *not* with pursuing the traditional epidemiologist's charge of assessing whether a chemical is generally capable of causing harm at some yet undetermined level in the general population, but with assessing the extent of any "Probable Links" with C-8 among the *Leach* class. (MDL820-8 Agreement §12.2, PageID11823.) The parties specially defined a "Probable Link" to mean "it is *more likely than not* that there is a link between exposure to C-8 and a particular Human Disease *among Class Members.*" (*Id.* §1.49, PageID11805.) The parties further agreed that, until the Science Panel

_____

[6] Any suggestion by *amicus* that enforcement of the Agreement's terms impacts any other entity is belied by the express terms of the Agreement itself, which makes clear that it binds *only* DuPont and the *Leach* class members. In addition, any suggestion that requiring DuPont to comply with the terms of its Agreement would somehow discourage other companies from negotiating their own special contracts to resolve tort claims outside the traditional tort law system is belied by the fact that there is no evidence of a *single other company* making any attempt to follow this Agreement (or anything even remotely similar) in the entire *twelve years* since it was first signed.

8

completed its work – in the form of "Probable Link" "Findings", all *Leach* class members would be barred from further litigating their health claims. (*Id.* §§3, 6, PageID11809-13.)

The parties also agreed that, once the Science Panel released its final "Probable Link" Findings, the only health-related claims that class members could pursue would be those related to diseases for which the Science Panel found a "Probable Link." (*Id.*) All other health-based claims of the class members relating to C-8 exposure would be released, "forever barred," and dismissed with prejudice. (*Id.* §3.3, PageID11810-11.)

The parties agreed that, if a "Probable Link" was found, DuPont would be "forever barred" from contesting or disputing in the context of an individual class member's case "that it is *probable* that exposure to C-8 *is capable of causing*" the linked disease(s) among class members. (*Id.* §1.25, PageID11804 (emphasis added).) This is the concept the parties defined in their Agreement as "General Causation." (*Id.*) DuPont still preserved the right to challenge "Specific Causation and damages as to any individual Class member" and other "defenses not barred by" the Agreement. (*Id.* §3.3, PageID11810-11.) The parties defined "Specific Causation" in this context to mean "that it is probable that exposure to C-8 *caused* a particular ["linked" disease] *in a specific individual*" within the class. (*Id.* §1.60, PageID11806 (emphasis added).)

9

Thus, under the Agreement, the issue of whether a *Leach* class member had a sufficient threshold exposure to or "dose" of C-8 to be capable of causing the "linked" disease was specifically incorporated into the scope of the "General Causation" issue to be resolved by the Science Panel's "Probable Link" findings. When defining the "Probable Link" that would be sufficient to satisfy the parties that "General Causation" had been resolved for purposes of *this* group of people under *this* specific Agreement, the parties agreed that there could be no "Probable Link" to any such disease(s), unless the "link" is found by the Science Panel to be one that is both "probable" – "more likely than not" – *and* one that exists "***among Class Members.***" (*Id.* §1.49, PageID11805) (emphasis added.) "Class Members" included only those individuals who could prove that they consumed for at least one year water contaminated with a minimum amount of 0.05 ppb or more of C-8, (*id.* §2.1.1, PageID11807), thus not including every person who had "just one sip" of a detectable amount of C-8 (0.01 ppb at the time), but would include only those persons who could show that they were actually exposed to a quantifiable amount of C-8 (0.05 ppb at the time) and for at least one year or more. (*Id.* §2.1.1, PageID11807; MDL2702-3 Smith Report, PageID40210-12.)

Thus, the parties made clear through the specially-defined terms of their Agreement that, as long as an individual proves that he/she had the minimum C-8 dose/exposure level to qualify as a "Class Member," the individual, *by definition*,

would necessarily have the requisite C-8 exposure and dose deemed sufficient by the parties for the existence of any "Probable Links" confirmed by the Science Panel. And DuPont agrees. (MDL820-25 Mem., PageID12001-02) (DuPont explains that the "Science Panel will . . . make a determination of whether it is more likely than not that PFOA exposure *at the levels experienced by residents of communities in West Virginia and Ohio* is capable of causing serious latent disease") (emphasis added); MDL820-21 Letter, PageID11981 ("Is PFOA exposure *as experienced by the class* capable of causing serious latent disease?") (emphasis added); MDL820-27 Tr., PageID12012-13 (DuPont explains that Science Panel will resolve "the heart of the question of whether C-8 is related to or causes any human disease in this community *with the C-8 at the levels that it is in the water*.").)

The parties understood that they were settling common, *class-wide* claims on a *common*, *class-wide* basis (with no subclasses or differing benefits dependent on different subclass membership criteria like different dose or exposure quartiles/levels). Thus, the parties have never suggested to Class Members that there was any possibility that only some, such as those at the highest C-8 exposure levels, would get the benefit of the "Probable Link" Findings and DuPont's corresponding agreement not to contest "General Causation," while others would not. To the contrary, the Agreement ensures that any "Probable Link"-related class

11

benefits or releases/dismissals either would be triggered for *all* members of the

Class or for *none.* (MDL820-8 Agreement §3.3, PageID11810-11.) This shared

understanding was confirmed to all Class Members in the jointly-drafted Notice

sent to all Class Members in 2004:

> If the Science Panel determines a Probable Link exists
> between C-8 exposure and Human Disease(s), each Class
> Member will retain the right to pursue their own individual
> personal injury claims against DuPont to the extent such claims
> relate to the specific Human Disease(s) for which the Science
> Panel finds a Probable Link with C-8 exposure.

(MDL820-11 Notice, PageID11857 (emphasis added).)

And DuPont benefitted from this shared understanding in 2012 when the

parties filed a dismissal, with prejudice, of the remaining health claims *of the entire*

*Class* with respect to the diseases not related to those for which the Science Panel

found a "Probable Link." (MDL820-13 Dismissal, PageID11865.) Thus leaving no

opportunity for Class Members with even the highest exposure levels to maintain

claims for non-Linked diseases.

As to its methods, the parties agreed that the Science Panel was to select its

own "objective criteria" and "protocols" to evaluate all the available evidence,

when assessing Probable Links, which could include review of multiple studies

and varying levels of exposure. The Panel would then submit a single, ultimate

"Finding" and *conclusion* as to "whether such evidence demonstrates a Probable

12

Link" with respect to a particular human disease, or not, for the Class. (MDL820-8 Agreement §§12.2.2, 12.2.3(b), 12.2.3(b)(1), PageID11823-25.)

And the *Leach* Court confirmed in its Final Order approving the settlement that the terms of the Agreement eliminated the need for all Class Members "to wait for the uncertain outcome of a lengthy trial nor face the possibility of no recovery," because the "terms of the Settlement adequately address any claims by Class Members for personal injury … in the event that the Science Panel finds a Probable Link." (MDL820-9, Order, PageID11840.) The *Leach* Court expressly found that there would be "no remaining issues to be litigated in this matter, as the Settlement sets forth adequately the agreed upon mechanism to determine whether . . . some Class Members may pursue individual claims against DuPont." (MDL820-9 Order, PageID11844.)

The Science Panel reviewed relevant health data, including an analysis of health records and blood samples from over 69,000 Class Members, and implemented its own studies into the health effects of C-8 on Class Members. (MDL3972 DMO 1-A, Page ID68170.) As part of its overall study protocol, the Science Panel reviewed and evaluated data from a large number of individual studies and data sources before reaching a, final conclusion on any "Probable Links." Some of these individual studies referred internally to associations with diseases at certain C-8 levels, while others suggested no such association, or

13

indicated an association but at different C-8 levels. The Panel carefully weighed and evaluated *all* of these individual studies and data according to the objective criteria the Panel itself selected for that purpose, and issued final written "Findings" as to whether *all* of the studies and data had persuaded the Panel that there either was a "Probable Link" or "No Probable Link" with particular diseases among Class Members, including an ultimate "Finding" that a Probable link existed for kidney and testicular but no other cancers. (MDL1152-11 Findings, PageID15833.)

In that cancer report, the Science Panel made clear that they understood that "[a] 'probable link' in this setting is defined in the Settlement Agreement to mean that given the available scientific evidence, it is more likely than not that ***among class members*** a connection exists between PFOA exposure and a particular human disease." (*Id.* (emphasis added).)

In November 2012, the parties notified the *Leach* Court that the Science Panel had found "Probable Links" between C-8 and six diseases, including kidney cancer. Shortly thereafter, under the Agreement, a dismissal of claims was entered for *all* Class Members with respect to the over 40 diseases for which the Science Panel had *not* found a Probable Link. (MDL820-13 Dismissal, PageID11865-72.) Thus, by that point in 2012, DuPont got the benefit of broad, all-encompassing

14

releases and dismissals with prejudice of the health claims of *tens of thousands* of Class Members with *dozens* of serious diseases.

### C.    The District Court Litigation

After release of the final "Probable Link" reports in 2012, individual *Leach* Class Members began filing complaints against DuPont relating to their previously stayed/reserved C-8 health claims for the six "linked" diseases. At DuPont's request, an MDL was created to coordinate resolution of those cases on April 9, 2013.

Six cases (three chosen each by defense and plaintiffs) were selected for the initial bellwether trials. Mrs. Bartlett's case, a defense pick, was the first to go to trial in September 2015. The jury awarded Mrs. Bartlett $1.6 million in compensatory damages.

DuPont confidentially settled the second case. The third case, which involved testicular cancer, resulted in a July 2016 jury award of $5.1 million. *Freeman v. DuPont*, No. C2-13-1103 (S.D. Ohio) (R101, Page ID1027). The *Freeman* jury also found that DuPont had acted with malice and with a conscious disregard for the rights and safety of others that had a great probability of causing substantial harm and awarded $500,000 in punitive damages *plus* attorneys' fees and costs. Also in July 2016, DuPont confidentially settled the remaining two

15

bellwether kidney cancer cases. The next case is scheduled for trial in November 2016.

## SUMMARY OF THE ARGUMENT

DuPont claims the district court erred by enforcing the Agreement entered into between DuPont and Mrs. Bartlett. DuPont's argument is contradicted by the unambiguous language of the Agreement and by the record, including voluminous trial testimony.

DuPont's obligations to Mrs. Bartlett are governed by the terms of the Agreement. Under the Agreement, DuPont agreed to be bound by the Probable Link Findings of the Science Panel. If the Science Panel found a Probable Link between C-8 and a disease among *Leach* Class Members, those Class Members would not be required to come forward with evidence proving that their individual dosage of C-8 is sufficient to permit the Probable Link Findings to be applied to them. To qualify as a Class Member, a plaintiff would have to prove that they had the requisite minimum dose or exposure to C-8 of 0.05 ppb C-8 in their drinking water for one year or more.

DuPont attempts to discharge itself from its contractual obligations to Mrs. Bartlett (and the *Leach* Class), by arguing that the district court misinterpreted four separate terms within the Agreement and by inserting a term into the Agreement allowing it to improperly attack the Science Panel's protocols. DuPont's arguments

16

are contradicted by the Agreement's plain language, which the district court properly enforced. DuPont's interpretation of the Agreement's terms and its attempt to insert a term into the Agreement to allow it to attack the Science Panel's protocols is not consistent with the plain meaning of the Agreement, especially when all provisions of the Agreement are construed in harmony to promote consistency and avoid repugnancy and rendering the language in the Agreement and the Agreement itself meaningless. Allowing DuPont to dissect the Science Panel's protocols would essentially "turn the clock" back to 2001 when litigation relating to C-8 was first filed against DuPont.

DuPont's refusal to recognize the Science Panel's findings directly resulted in DuPont's feigned claims of prejudice at trial. Notwithstanding that DuPont's refusal to accept the unambiguous terms of the Agreement caused the prejudice it now claims on appeal, the district court permitted DuPont to elicit extensive testimony in support of its defenses, and DuPont's experts were allowed to testify on everything on which they appropriately opined. DuPont greatly exaggerates the impact of the district court's rulings on its ability to present evidence, and any prejudice that DuPont suffered at trial was of its own doing.

DuPont's argument that the district court allowed Mrs. Bartlett's experts to improperly testify is also meritless. The district court only permitted Mrs. Bartlett's experts to testify on the state of the medical and scientific knowledge and the

standards of care within these fields, and to compare DuPont's compliance with or deviation from those standards. The district court carefully narrowed the scope of expert testimony and Mrs. Bartlett's experts were not permitted to testify regarding DuPont's intent, motive, or state of mind or whether DuPont's acts were negligent. The district court provided clear and repetitive instructions regarding standard of care and negligence, which DuPont cannot dispute.

DuPont's argument that the district court misinterpreted the legal standard for NIED is wrong. DuPont attempts to nullify the jury's verdict by advancing an argument on appeal that it failed to make at the trial level and has waived. Even though DuPont's argument should be rejected on this ground alone, the burden of proof on Mrs. Bartlett was the same whether her NIED claim was presented as a stand-alone claim or as an element of damages on her negligence claim, and the jury's findings supported damages for emotional distress under either claim. Also, DuPont has failed to show any prejudice.

Finally, the district court properly held that Ohio's Tort Reform Act of 2004 did not apply to Mrs. Bartlett's case. Applying Ohio's limitation on noneconomic damages to Mrs. Bartlett's claims would constitute an impermissible retroactive application of the statute and, even assuming *arguendo* that the statute may apply retroactively, regardless of when the defendant's tortious conduct or plaintiff's

injury occurred, Mrs. Bartlett's claims clearly accrued prior to the effective date of the statute.

## ARGUMENT

**I.    The District Court Did Not Erroneously Enforce The Terms Of The Parties' Agreement.**

To date, the main benefits of the Agreement have flown in one direction—toward DuPont. It has been relieved of potentially thousands of claims involving dozens of diseases as a direct result of that Agreement. But now, seeking a reinterpretation of that Agreement, DuPont wants to deprive Mrs. Bartlett of her benefit. DuPont contends that despite the fact that Mrs. Bartlett has a Linked Disease, kidney cancer, and was exposed to sufficient amounts of C-8 to be a Class Member, she should still be denied the benefit of the Science Panel's Probable Link Findings. Judge Sargus repeatedly rejected DuPont's arguments and this Court should as well. (*E.g.*, R161 DMO12, PageID8258-8328.) DuPont was permitted to contest specific causation, was permitted to talk about alternative causes, and was permitted to present evidence of dosage. Indeed, DuPont got the trial that it now says it seeks on appeal.

The Agreement is a contract and "in interpreting a contract, it is not the Court's function to speculate "concerning what the parties meant to express or should have expressed," nor is it the right or the province of the Court to alter or amend the contract of the parties where they have expressed their intent in clear

and unambiguous language." *United States v. Marietta Mfg. Co.*, 339 F. Supp. 18,

23-24 (S.D.W.Va. 1972) (applying W.Va. law) (citation omitted). Indeed, a court

lacks the power "to add terms to [a] contract negotiated by the parties." *Id.*

(citation omitted).

The *Leach* settlement was unique. The Science Panel was tasked with

studying the *Leach* Class to determine if there was a Probable Link between

"exposure to C-8 and a particular Human Disease among Class Members."

(MDL820-8 Agreement §1.49, PageID11805.) The Science Panel took a defined

level of exposure and evaluated whether that level was capable of causing any of

the diseases that it evaluated. As the District Court stated:

> [T]he *Leach* Settlement Agreement established a novel procedure for
> dealing with the approximately 80,000 individuals that make up the
> Leach Class by establishing the Science Panel and directing its work.
> Unlike the usual situation where epidemiologists start with a chemical
> exposure and then attempt to define the dose of that chemical which
> presents a sufficiently increased risk to conclude that such dose is
> "more likely than not" sufficient to cause a particular disease, the
> parties directed the Science Panel to follow a very different process.
> The Science Panel was focused on an identified group of people (the
> *Leach* Class) with a defined level of exposure (.05 ppb or greater of
> C-8 for the period of at least one year) to [C-8] and determine, not
> how much of the chemical it might take to cause various diseases in
> humans generally, but which diseases were linked to the actual C-8
> exposures in that defined group. The Science Panel's Probable Link
> Findings are, by agreement of the parties and by definition, links that
> exist and are "probable" in the entire *Leach* Class.

(MDL3972 DMO1-A, PageID68174.)

There is nothing ambiguous in the Agreement regarding the Science Panel's mission and its findings and nothing that allows DuPont to attack the protocols or the objective criteria it used to evaluate the evidence. DuPont's interpretation of the Agreement to allow it to attack the Science Panel's protocols would not only undermine and undo the entire *Leach* class settlement but would require the Court "to add terms to the [Agreement] which the parties did not see fit to incorporate at the time of their negotiations," *Marietta*, 339 F. Supp. at 23, and is wholly improper. (MDL1679 DMO1, PageID22983-84.)

In keeping with the unique nature of the Agreement, which was focused on confirming the "*probable*" — "more likely than not" — health effects of C-8 exposure among these specific Class Members, the parties did *not* adopt the "traditional tort law" definition of "general causation" of "whether a substance is *capable* of causing a particular injury or condition *in the general population*," but, instead, specifically defined "General Causation" in the Agreement to "mean that it is *probable* that exposure to C-8 is capable of causing" the "linked" disease(s) in the class actually being studied. (MDL820-8 Agreement §1.25, PageID11804 (emphasis added); MDL1679 DMO1, PageID22984.) That finding applied to all Class Members and not just a subset. The parties, likewise, specially defined "Specific Causation" to mean "that it is *probable* that exposure to C-8 caused a

21

particular ["linked" disease] *in a specific individual*" within that Class. (MDL820-8 Agreement §1.60, PageID11806 (emphasis added).)

### A.   The District Court Properly Applied The Phrase "Among Class Members" Consistent With The Plain Language And Intent Of The Agreement.

DuPont incorrectly contends that the trial court "rewrote" the Agreement through its interpretation of "Probable Link" and specifically what "among Class Members" means in the phrase "it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class members." DuPont contends that, because dosages vary throughout the Class, every Class Member with a linked disease must still prove that his or her specific exposure level caused his or her specific disease. In other words, "among Class members," to DuPont, means that some of the Class Members have a linked disease capable of being caused by C-8 and some do not – even if all of them could prove exposure at the 0.05 ppb of C-8 for at least one year. DuPont is wrong. As the trial court explained, because the Probable Link finding applied to Mrs. Bartlett, she was not required to prove that her C-8 dose or exposure was *capable* of causing her kidney cancer – that link has been established pursuant to the parties' Agreement.

DuPont argues that "[i]f the parties had intended the meaning envisioned by the district court, they would have said "in every individual Class Member," (DuPont's Br. at 22), but this is ***exactly*** what the parties said. Section 1.11 of the

Agreement defines "Class Members" as "those ***individuals*** who are members of the Certified Class . . . .." (MDL820-8 Agreement §1.11, PageID11803.) The Agreement's plain language makes it clear that the Science Panel's Findings applied to all individual Class Members, and not just "some" of the Class Members as suggested by DuPont, and that each Class Member's level of exposure was not relevant when considering class benefits.

The district court repeatedly made clear that DuPont's interpretation of "among" was contrary to the plain language and the intent of the Agreement, (MDL1679 DMO1, PageID22982-85; MDL3972 DMO1-A, PageID68169; R161 DMO12, PageID8268), and that DuPont's interpretation would render the Agreement meaningless, because it would permit suits by *Leach* Class Members who suffered from "non-linked" diseases to "point out the nuances and the limitations of the Science Panel's findings to show how [their] dosage of C-8 prevents the No Probable Link Finding from being applied to [them]," (MDL1679 DMO1, PageID22984), as well as eviscerate DuPont's concession of General Causation (MDL3972 DMO1A, PageID68171).

DuPont's definition of "among" would lead to the precise situation the parties were attempting to avoid when they entered into the class-wide Agreement, which was to avoid a contentious, costly, and time-consuming litigation that would involve a courtroom "battle of the experts" on the common issue of General

23

Causation. (*See* MDL1679 DMO1, PageID22984; MDL3972 DMO1-A,
PageID68171.) "Reading [among] in context and with a view to its place in the
overall contract leaves the meaning absent of ambiguity." (MDL3972 DMO1A,
PageID68170-71.) For example, the parties also agreed that the "Agreement
contains the entire agreement *among* the Settling Parties relating to this
Settlement." (MDL820-8 Agreement §14.12, PageID11831 (emphasis added).)
Clearly, DuPont would not argue that "among" in §14.12, only refers to an
"intermingled" subset of the Class and not the entire Class.

Given that this Agreement was setting forth the terms for resolving *class-
wide* claims on a common, *class-wide* basis – not distinguishing any sub-classes
for different treatment, reading the Agreement in this class settlement context
makes clear that DuPont's attempts to re-write the Agreement now to try to create
different triggers for different benefits and releases/dismissals among Class
Members – more than a *decade* after the Agreement was written and after the Class
has received notice of and approved the Agreement – would be wholly improper
and would up-end the entire class settlement.

    **B.**    **Dupont Improperly Attempts To Rely On A Definition Of
           General Causation That Is Not Included In The Agreement.**

DuPont's additional attacks on the Agreement relating to the definition of
General Causation as it may otherwise be used in traditional "toxic tort" law also
lack merit. "[I]n spite of the [Agreement's] clear contractual language,"

(MDL1679 DMO1, PageID22984), DuPont argues that the parties' definition of General Causation "tracks" the definition of general causation in toxic tort cases and thus should be interpreted in that manner. (DuPont's Br. at 19.) DuPont is wrong and is careful not to argue that the basis for finding General Causation as used in the Agreement is *identical* to the definition used in toxic tort case law, because it is not.

Here, the parties specifically and purposefully defined the contractual trigger for DuPont to no longer contest "General Causation" to be a Science Panel Finding of a "Probable Link," defined as: "that it is probable that exposure to C-8 is capable of causing a particular Human Disease among class members." (MDL820-8 Agreement §1.49, PageID11805.) The phrase, "in the general population" is not included in the Agreement, because it would have been inconsistent with the other provisions of the Agreement that tasked the Science Panel with studying diseases *among the Class Members*. (MDL1679 DMO1, PageID22985; MDL3972 DMO1-A, PageID68173-74; R161 DMO12, PageID8270-71.) Indeed, when the Agreement was drafted, DuPont's lead counsel explained that the Science Panel will resolve "the heart of the question of whether C-8 is related to or causes any human disease in this community with the C-8 at the levels that it is in the water." (MDL820-27 Tr., PageID12012-13.)

25

DuPont's reliance on *Rhodes v. DuPont*, 253 F.R.D. 365 (S.D.W.Va. 2008) is misplaced. A reading of the entire relevant section, and not just the few phrases cited by DuPont, makes clear that the *Rhodes* court recognized the unique nature of the *Leach* settlement and that DuPont's concession in *Leach* was irrelevant to the proposed *Rhodes* class, because it was applicable only to *Leach* Class Members and *not* the general population/*Rhodes* class. *Id.* at 375. There is nothing in *Rhodes* that conflicts with the district court's rulings. Read in context, the court unmistakably held that DuPont's concession in *Leach* only applied to *Leach* Class Members and could not be applied to the general population. Moreover, *Rhodes* was issued in 2008, five years before the Science Panel found that C-8 was linked to cancer.

Early in this case, DuPont tried to deny Mrs. Bartlett the benefit of her bargain by asserting that it was entitled to (1) "point out the nuances and limitations of the Science Panel's findings," and (2) argue that "dosages of C-8 for individual plaintiffs must be examined and a determination made *as to whether the Probable Link Finding* applies to the individual." (MDL1679 DMO1, PageID22981.) DuPont argued that the Science Panel's Probable Link Finding represented nothing more than a finding that some level of C-8 could cause kidney cancer in some humans generally and thus DuPont retained the right to contest as part of its retained "*Specific* Causation" defense under the Agreement whether any

Class Member's C-8 exposure was sufficient to be capable of causing kidney

cancer. (*Id.*, PageID22981.)

Yet because the Science Panel was specifically charged with confirming

which Probable Links actually exist *among these Class Members*, the Probable

Link Finding, *by definition* under the parties' Agreement, already incorporates the

requisite exposure/dose of C-8 as being that sufficient to qualify as a Class

Member. (*Id.*, PageID22981-82.) Thus, once Mrs. Bartlett proved that she had that

requisite C-8 exposure, she became part of the group where the Science Panel

found the Probable Link to exist. Although DuPont could point to *other* potential

causes for her disease as part of its "Specific Causation" defense, it could not

contest the sufficiency of Mrs. Bartlett's C-8 exposure or "dose" to be capable of

causing her disease.

Based on the language of the Agreement, the district court rejected DuPont's

arguments well in advance of trial. (MDL1679 DMO1, PageID22982-83.) Despite

the court's clear guidance, DuPont continued to argue that it should be allowed to

dissect the "Probable Link Reports." (*Id.*) The district court *again* rejected

DuPont's argument, noting that DuPont was "unquestionably" challenging General

Causation under the Agreement. (MDL3972 DMO1-A, PageID68167-68; *see also*

*id.*, PageID68170-71) ("DuPont's mistake is focusing on the Science Panel's

*reports/evaluations* instead of its *Findings*").)

27

The court also reiterated its view in its *Daubert* rulings. (MDL4079 EMO1,

PageID71850, 71856 ("However, DuPont continues to confuse the Probable Link

Finding with the Probable Link report.").) The court noted that:

> ***DuPont has contractually agreed that its experts must rule in C-8 as***
> ***a possible cause of Mrs. Bartlett's kidney disease*** . . . . . Accordingly,
> the **portions** of … Dr. Cohen's opinions that fail to rule in C-8 as a
> possible cause of the Trial Plaintiffs' Linked Diseases [as required
> under a proper differential diagnosis] are unreliable and excluded
> under *Daubert* and the Federal Rules of Evidence.

(*Id.*, PageID71861 (emphasis added).)

Notwithstanding these rulings, DuPont continued to be able to present its

evidence and arguments on "*Specific* Causation," and presented the jury with

substantial Specific Causation evidence (discussed below).

### C.    The District Court Properly Allowed Evidence Relating To Specific Causation.

Regardless of DuPont's challenges to the trial court's enforcement of the

Agreement, the court permitted DuPont to challenge Specific Causation, including

discussing dosage and alternative causes. Moreover, the trial court never told the

jury that Mrs. Bartlett's exposure definitively caused her cancer and permitted, of

course, DuPont to argue that C-8 did not cause her cancer.

In pre-trial rulings, the district court held that the *only* manner in which

DuPont's use of or reference to "dose" or "exposure" concepts would be limited at

trial is in the context of contesting or challenging General Causation, (*id.*,

PageID68171). Indeed, as noted above, the trial court "did not exclude all of the testimony of DuPont's specific causation expert, Dr. Cohen, but rather, only that testimony related to or that resulted from his failure to rule in C-8 as a possible cause of Mrs. Bartlett's kidney cancer." (MDL4206 MIL Order 2, PageID80887.) In other words, the court only excluded DuPont's attempts to offer evidence to contest *General* Causation – not *Specific* Causation under the Agreement. DuPont remained free to refer to the individual class member's C-8 dose or exposure levels as often as it wanted in the context of challenging "*Specific* Causation."

The unambiguous language in the Agreement provides that the Probable Link Finding applies to Mrs. Bartlett, which means that it is more likely than not that there is a link between her exposure to C-8 and her kidney cancer. The district court *did not* instruct the jury that exposure to C-8 at 0.05 ppb for one year causes kidney cancer *or* that it was the causation standard. Indeed, the district court cautioned the jury:

> To be clear, DuPont is contesting what I just described as specific causation. So this issue is a disputed fact which you will decide. Ms. Bartlett has the burden of proving by a preponderance of the evidence that in her actual case, her kidney cancer was caused by C-8 and not some other cause unrelated to C-8.

(R161 DMO12, PageID8275.)

The district court provided the instruction to the jury at the very beginning of the trial, and the same basic instruction no less than *eighteen additional times*

29

throughout the course of the trial. (*Id.*) Moreover, at the conclusion of the trial, the

Court again instructed:

> Following presentment of this case, I instruct you that
> Mrs. Bartlett has conclusively established that she drank water
> for more than one year having a C-8 content of more than .05
> parts per billion. Therefore, you will treat as proven in this case
> that Mrs. Bartlett has established that C-8 is *capable* of causing
> her kidney cancer. While this fact is established, you will still
> decide whether Mrs. Bartlett has proven all the elements of her
> claim and that, in her case, the kidney cancer *was caused* by C-8.

(*Id.*, PageID8276 (emphasis added).)

Thus, even if there had been *any* potential confusion created by the few

selective quotes in DuPont's Brief relating to Mrs. Bartlett's burden to prove

"*Specific* Causation," the Court's repeated clarifying instructions as to the proper

standards in this regard, including right before deliberations, addressed and cured

any potential for prejudice to DuPont and, if anything, amounted to nothing more

than harmless error. (*Id.*, PageID8275-76.) Furthermore, DuPont failed to make

contemporaneous objections, which would have permitted a re-wording. (*Id.*,

PageID8275.)

As to Dr. Cohen's opinions on obesity as a potential cause of the cancer, the

Court specifically noted that "there is evidence in the record that obesity is a cause

of kidney cancer *and DuPont is not prohibited from offering that evidence.*" (*Id.*

(emphasis added); *see also* MDL4226 EMO1-A, PageID81637 (Dr. Cohen

admissible to rebut specific causation of disease by C-8).) Thus, DuPont presented

extensive testimony on this issue at trial. Dr. Cohen testified that obesity is a cause of kidney cancer and that Mrs. Bartlett's obesity increased her risk of contracting kidney cancer by "more than double." (R161 DMO12, PageID8284-88 (citing trial testimony).)

Importantly, the trial court permitted testimony from DuPont's experts about dosage. Dr. Cohen testified that Mrs. Bartlett's expert, Dr. Bahnson, inadequately considered Mrs. Bartlett's dose and exposure to C-8 when responding to a question applying the dose issue here to the "pack-year concept" in the individual smoker context. (R133 Trial Tr., PageID5192-93.) Dr. Cohen also testified that Mrs. Bartlett's 2005 C-8 blood level was much lower than the mean level for the community and the residents in her water district. (R133 Trial Tr. PageID5194.) The district court even instructed the jury during Dr. Cohen's testimony that "the dosage, the quantity in the water and the length of time may have something to tell you about how you decide what caused the kidney cancer." (R133 Trial Tr., PageID5195.)

Similarly, DuPont's expert, Dr. Rickard, was permitted to testify extensively about the "fundamental" importance of dose in toxicological analyses of safe chemical levels, using everyday examples of alcohol, aspirin, water, sugar, and caffeine, as compared to historical C-8 guideline levels from the 1970s through the 2000s. (R136 Trial Tr., PageID5610-14.) Also with respect to dose, Dr. Rickard

31

gave examples of how small a part per billion is, testifying that it is the equivalent of one penny out of $10 million and the time equivalent of one second in 32 years. (R136, Trial Tr., PageID5614.) This testimony then set the stage for Dr. Rickard's extensive dose-related testimony on biological variability, (*id.* PageID5619), acceptable exposure limits and community exposure guidelines for C-8 with large safety margins, (*id*. PageID5622-5626), high dose animal studies being irrelevant to humans, (*id*. PageID5654), the "no observed effect" dose level, (*id.* PageID5656), the relative dose levels of C-8 animal studies being 60,000 – 150,000 ppb, (*id.* PageID5657, 5690), the relative C-8 levels in 3M workers' blood of 5,000 – 70,000 ppb, (*id*. PageID5658), and the relative C-8 levels in DuPont workers' blood of 500 – 30,000 ppb, (*id*. PageID5659). Dr. Rickard then opined that, considering "all the information" over the years, DuPont would not expect any health effects to area residents from community levels of exposure to C-8, and noted that Mrs. Bartlett's 2005 C-8 blood level was 19.5 ppb, while the range in the general U.S. population is 1-77 ppb. (*Id*. PageID5739.)

Furthermore, DuPont's counsel extensively referred to dose in his closing argument. Indeed, DuPont focused much of its closing on arguing dose to the jury. (R145 Trial Tr., PageID6398-99.)

Although DuPont was, likewise, free to question about dose and exposure beyond these examples and free to call several other experts, such as Mr.

32

Washburn,[7] to provide additional evidence and opinions at trial on such issues,

*DuPont simply chose not to do so.* As the district court noted:

> DuPont had the opportunity to direct its expert within the parameters of the … Agreement, but chose not to do so. Consequently, any prejudice DuPont suffered related to exclusion of a portion of Dr. Cohen's opinion was by its own hand.

(R161 DMO 12, PageID8283.)

The District Court clearly permitted DuPont's experts to fully testify on dose and exposure issues, so long as they did not cross the line and give an opinion that C-8 exposure at .05 ppb in drinking water consumed for over one year is incapable of causing Mrs. Bartlett's kidney cancer, which would clearly be an attack on General Causation barred by the parties' Agreement.

At the end of the day, the jury simply did not agree with DuPont that obesity (or some other factor, other than C-8) was the more likely cause of Mrs. Bartlett's cancer, after considering all of the evidence and arguments, including evidence of Mrs. Bartlett's specific C-8 water and blood levels and duration of exposure. DuPont's failure to persuade the jury of its position at trial, based on the experts

---

[7] For example, DuPont did not call Mr. Washburn to offer his opinions that Mrs. Bartlett's C-8 levels were far lower than those found in the occupational exposure groups that had been studied, which DuPont argued is "directly relevant to weighing the competing risks that Plaintiff had of getting kidney cancer due to her obesity and due to her exposure to C-8" and thus "probative of whether one risk factor or another is the more likely cause of a disease" and thus "directly probative on the issue of specific causation." (MDL4150 Opp. to MIL 15, PageID78958-59.)

and evidence DuPont chose to present – and purposefully chose not to present – is not a basis for nullifying the jury's verdict.

## II.    The Trial Court Did Not Err In Permitting The Testimony Of Mrs. Bartlett's Experts.

DuPont's argument that the trial court erred in allowing certain parts of the testimony of Plaintiff's experts to be presented to the jury is wrong. The trial court carefully controlled and narrowed the scope of the testimony before the trial began. (MDL4129 EMO2, PageID78686-90.) The experts were not permitted to testify regarding DuPont's intent, motive, or state of mind; whether DuPont's acts were "negligent" or "fraudulent"; what inferences they drew about DuPont's behavior; or about the "general duty of care that any company would be expected to fulfill." (*Id.*, PageID78686-88.) Mrs. Bartlett's experts were only permitted "to testify as to the prevailing state of the medical and scientific knowledge and the standards of care existing with these fields, and to compare DuPont's compliance with or deviation from those standards, precisely as DuPont's own experts were permitted to do. (*Id.*, PageID78690.)

Mrs. Bartlett's experts, Dr. Siegel and Mr. Petty, stayed within those boundaries. (R161 DMO12, PageID8310-11.) "DuPont does not cite to a single instance where [Dr. Siegel] used the terms 'negligent' or 'breach' … nor where the experts testified to DuPont's state of mind, motives or intent." (*Id.*, PageID8310.) These were not biased experts driving toward an outcome, and the trial court made

34

careful decisions to ensure that the testimony met the standards of FRE 702 and did not unfairly prejudice the jury.

Indeed, from the beginning of this case, DuPont's own defense was premised on its assertions like this: "all conduct and activities of DuPont related to matters alleged in the Complaint conformed to industry standards based upon the state of medical, scientific and/or industrial knowledge which existed at the time or times that Plaintiff is alleged to have been exposed." (MDL35 Answer, PageID298) (MDL4129 EMO2, PageID78673.) DuPont's own experts, including Mr. Voltaggio, were never prohibited from testifying on these *very same issues of* corporate conduct and "state-of-the art" at trial – DuPont simply made the strategic decision not to call all of those experts or to offer all of those contrary opinions. (MDL4129 EMO2, PageID78671-72.)

### A. Mrs. Bartlett's Experts Did Not Create And Invoke An Erroneous Duty Of Care.

This Court reviews evidentiary rulings for abuse of discretion. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008). An expert's opinion is admissible if, in the trial court's view, "the witness [is] qualified by 'knowledge, skill, experience, training, or education'[;] … the testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue'[; and] … the testimony must be reliable." *Id.* at 528-29 (quoting FRE 702). An expert witness may opine on the ultimate issue in the case. FRE 704.

DuPont incorrectly argues that the trial testimony of two of Mrs. Bartlett's experts – Dr. Siegel and Mr. Petty – introduced "an amorphous and confusing concept" related to the applicable "duty of care." (DuPont Br. 38.) DuPont picks small snippets of testimony, then picks up on buzzwords like "public health" and "precautionary principle," throws in some academic literature, and claims reversible error. In reality, what Plaintiff's experts did is exactly what DuPont's experts did. As stated by the trial court, expert testimony that addresses "DuPont's stewardship of C-8 within the framework of the then-governing industry standards, best practices, and the state and federal regulatory programs" "will assist the trier of fact" in determining whether a legal duty of care existed and was breached, and is not by such nature "unfairly prejudicial, confusing, [or] misleading," but is, in fact, evidence "of the type contemplated for submission to the jury under Rule 702 and *Daubert.*" (MDL4129 EMO2, PageID78664, 78673.)

The trial court also clarified the standard for addressing any such legal duty in a separate pre-trial ruling. (MDL4184 DMO6, PageID80086-90.) In that ruling on the legal duty of care, the Court noted that the testimony of Plaintiff's experts at issue in these areas was admissible to assist the jury in addressing the issue of duty. (*See id.*, PageID 80089.) Neither Dr. Siegel nor Mr. Petty deviated from the trial court's directive.

DuPont incorrectly contends that Mrs. Bartlett's experts manufactured their own "duty of care." The trial court determined that DuPont's duty was to prevent Mrs. Bartlett from being harmed by C-8 given what it knew and when. The jury was permitted to consider the extent of DuPont's warnings and disclosures in the context of evaluating Mrs. Bartlett's negligence-based claims. (R131-1 Trial Tr., PageID4673, 4678 ("I think it goes with the negligence theory in the sense that it would be the argument that you could prevent me from being harmed.").)

The bulk of testimony at trial addressed DuPont's basic failures to follow internal and external standards of care to prevent or abate/eliminate C-8 releases into the environment and resultant harm, including by incineration or proper landfilling, despite repeated instructions and warnings in DuPont's and 3M's Material Safety Data Sheets, as well as from DuPont's own lawyers, epidemiologists, toxicologists, and medical doctors. (*E.g*., MDL4235, DMO11, PageID81770-78.) DuPont contended the opposite - arguing that it had no knowledge, based on animal studies, 3M's research, and DuPont's monitoring of its own workers, that "there was any likelihood of any harm at the relatively low levels [of C-8] found outside the plant." (*E.g.*, R161 DMO12, PageID8309.) As the trial court found, the jury had sufficient evidence to reject DuPont's view. (*Id*. PageID8241-43 (citing to trial testimony).)

In addition, the trial court provided clear instructions (unchallenged on appeal) to the jury at both the beginning and end of the trial as to what their task was with respect to the relevant legal duty - not general ethical duties. At the very beginning of the trial, the Court instructed:

> When I say that Mrs. Bartlett must prove that DuPont owed her a duty of care, that means essentially that she must show that DuPont did not act reasonably, that a reasonable company or person would have anticipated that injury to a person was foreseeable from their conduct.

(R154 Trial Tr., PageID7162; R140-1 Instr. 20, PageID6252 ("The test is whether, under the circumstances, a reasonably prudent corporation would have anticipated that an act or a failure to act would likely cause injuries.").)

As the trial court explained, Dr. Siegel "made clear that the public health duty of care is not the same as the applicable *legal* duty of care that Plaintiff was required to prove" in his own testimony. (R161 DMO12, PageID8310-11 (citing R156-2 Trial Tr., PageID7813).) This type of testimony, as the trial court determined, was subject to vigorous cross examination by DuPont, challenging the weight of the evidence. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-31 (6th Cir. 2008). Judge Sargus also instructed that he alone would be giving the legal standard. (R140-1 Instr. 1, PageID6232.)

DuPont's current focus on Dr. Siegel and Mr. Petty's testimony regarding general corporate duties is an attempt to distract from the simple fact that DuPont knew of the dangers associated with C-8 but failed to take actions necessary to

prevent harm, resulting in the exposure of over 80,000 children, women, and men to a known carcinogen. This is not a case where Mrs. Bartlett sought to hold DuPont liable solely for violating a moral obligation or a social responsibility. This case was about how DuPont's *specific conduct* injured Mrs. Bartlett.

Moreover, DuPont's own experts were allowed to give the same type of industry and specialized standard of care testimony as Dr. Siegel and Mr. Petty and to opine that DuPont complied with such standards. (MDL4129 EMO2, PageID78671-74.) Nothing that the court said precluded DuPont from offering its own experts to counter Dr. Siegel and Mr. Petty in this regard. Although DuPont did rely on Dr. Rickard for some such testimony at trial, (*see, e.g.,* R136 Trial Tr., PageID5617-36; 5707-08; 5728), DuPont had other corporate conduct and "state of the art" experts, including Mr. Voltaggio and Dr. Snyder, that it simply decided not to call.

In this regard, DuPont's reliance on *In re: Welding Fume Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 146067, at *145-46 (N.D. Ohio June 4, 2010), is not persuasive. That case specifically held that it is the defendant's *conduct* that is relevant and admissible on the question of duty, which is *exactly* the type of evidence presented at Mrs. Bartlett's trial, notwithstanding DuPont's attempt to ignore this testimony and focus instead on supposed "ethics testimony." In

addition, Ohio law recognizes that there are a number of things that factor into the

question of duty:

> [a]ny number of considerations may justify the imposition of duty in
> particular circumstances, including the guidance of history, our
> continually refined concepts of morals and justice, the convenience of
> the rule, and social judgment as to where the loss should fall.

*Mussivand v. David*, 544 N.E.2d 265, 271 (Ohio 1989) (internal citations omitted).

Indeed, DuPont itself recognizes that a duty of care exists between a

company and the public on matters of public health:

> DuPont management feels that it is not only a matter of the duty or
> corporate ethics to report pertinent health information, but it is also
> good sound business practice. To do less would be more morally
> irresponsible and in many cases economically irresponsible.

(R156-1 Trial Tr., PageID7729 (Dr. Siegel reading internal DuPont document).)

DuPont places great weight on this Court's decision in *Tamraz v. Lincoln*

*Elec. Co.*, 620 F.3d 665 (6th Cir. 2010), which held that the specific causation

testimony of a treating physician should have been excluded. That case has no

applicability here. The court's discussion of the "precautionary principle" was in

the context of distinguishing between diagnosis and etiology (a distinction that the

plaintiff in *Tamraz* conflated) and why a treating physician might typically pursue

cautionary recommendations with patients. DuPont makes no argument that Mrs.

Bartlett's experts conflated those principles. And the *Tamraz* court emphasized that

physicians must testify about causes of medical conditions in order for plaintiffs to maintain causes of action. *Id.* at 673-74.

More importantly, all of this is inapposite to what Dr. Siegel and Mr. Petty testified about, consistent with the court's instructions to the jury – namely, the relationship between DuPont's specific conduct and its duty of care. DuPont also takes the experts to task for not considering the actions of other companies that have purportedly injured people through the use of C-8. But that is a classic weight-of-testimony argument that DuPont was free to make to the jury. *See In re Scrap Metal, supra*; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (alleged weaknesses in the factual basis of an expert opinion "bear on the weight of the evidence rather than on its admissibility"). In short, DuPont's arguments about the creation of a new standard here are incorrect.

### B.    Dr. Siegel's Testimony Was Proper Because It Did Not Offer Legal Conclusions.

#### 1.    Dr. Siegel offered testimony that assisted the jury. He did not merely tell the jury what result to reach.

Dr. Siegel's testimony involved reviewing existing information and literature, including DuPont's own documents, to determine what DuPont knew about the hazards of C-8, when it knew it, and, based on his experience and training, what DuPont should have done to avoid harm to those drinking the water in order to meet the applicable standard of care. Because that standard of care is

not generally known by laypeople, an expert's testimony is necessary and appropriate. As explained above, DuPont does not disagree.

DuPont complains that Dr. Siegel should not have been allowed to utter the words "standard" or "duty of care" because they are "legal terms"—talismans that an expert witness may not utter, because it is an attempt to tell the jury what result to reach. (DuPont Br. 43.) DuPont did not object during trial when those terms were used by Dr. Siegel.[8] And in any event, DuPont misreads the applicable law.

DuPont's argument incorrectly rests on the idea that "[t]he problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury." *Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). To avoid this, a court must "determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." *Id.* at 151.

DuPont's real argument is that the Court should make a new rule that an expert cannot state his opinion of the applicable standard of care and then compare it to the evidence of a defendant's actions. This Court holds otherwise. Testimony in which "experts applied their understanding of the standard-of-care to a limited

---

[8] Two of the times that DuPont claims Dr. Siegel used the terms are not in the record where DuPont claims them to be. (*See* R.155-1, PageID7556, 7570, cited in DuPont Br. at 44.)

sample of facts" is admissible. *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 348 (2015).

In *Volkman*, a defendant challenged a medical expert who testified that a prescription of medication to a patient was not "for any legitimate medical purpose"—an element of the crime at issue. *Id.* at 387-88. The Court explained that just because the same words were used does not mean that the witness's testimony was a legal conclusion: "Certainly, there is the *legal* question of whether a prescription had a 'legitimate medical purpose,' but the question is hardly answered in isolation. Rather, the 'lay' or … 'vernacular' understanding of the phrase—i.e., the phrase as used in medical parlance—naturally informs the legal question.... Therefore, the legal understanding of the phrase 'legitimate medical purpose' does not carry with it a 'separate, distinct and specialized meaning' from its medical counterpart; instead, one elucidates the other." *Id.* at 389-90 (citations omitted).

Dr. Siegel's testimony, like the testimony in *Volkman*, states a standard of care and compares the defendant's acts to that standard. Dr. Siegel did not attempt to define legal terms. Indeed, he testified on cross-examination that he was not doing so. (R156-2 Trial Tr., PageID7813.) Dr. Siegel used the terms "standard" and "duty of care" in the vernacular. He did not make a legal conclusion on the ultimate question. Dr. Siegel's testimony was helpful to the jury, because a

43

layperson does not know the standard of care that DuPont should use with respect to protecting the public from harm attributable to releases of a hazardous chemical. DuPont's arguments to the contrary are mistaken.

### 2.    If an error occurred, it was harmless.

Even if DuPont's argument was correct, any error in admitting Dr. Siegel's testimony was harmless. An erroneous evidentiary ruling is harmless unless it affects a party's "substantial rights" or if justice so requires. *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 584 (6th Cir. 2015) (citing FRCP 61). Among other things, Dr. Siegel's testimony was subject to vigorous cross-examination, as well as challenges from DuPont's experts. *See, e.g.*, *Torres*, 758 F.2d at 151 (countervailing testimony can demonstrate harmless error regarding legal conclusion testimony); *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919-20 (6th Cir. 1984) (same). Additionally, the trial court's clear instructions regarding standard of care and negligence, (R140-1, Instr. 19 & 20, PageID6251-52), would have cleared up any confusion or misunderstanding of the jury, if any had actually existed. *See, e.g. CFE Racing Prods.*, 793 F.3d at 589 (jury instructions cure error regarding legal conclusion testimony); *Davis*, 742 F.2d at 919-20 (same).

Moreover, the mountains of evidence demonstrating that DuPont knew for decades that C-8 was harmful but did not reveal that information shows that no

injustice was worked by the admission of Dr. Siegel's testimony. Mrs. Bartlett's experts, for example, examined many historical documents showing when DuPont knew C-8 was harmful but did nothing to reveal those dangers for many years thereafter. (MDL4129 EMO2, PageID78670.)

The trial court's consideration of these issues was thorough and evenhanded. There is nothing on this record to show an abuse of discretion, and in any event, if an error occurred it was harmless.

**III.    This Court Should Affirm The Jury's Damages Award For Negligent Infliction Of Emotional Distress.**

DuPont argues that the trial court erred by submitting Mrs. Bartlett's NIED claim to the jury because her NIED damages were tied to her kidney cancer and not stand-alone. DuPont also argues, in the alternative, that if her claim were stand-alone, she did not meet her burden of proof. DuPont's arguments are not well taken.

DuPont never made the first argument below and has waived it, as the trial court here pointed out and as DuPont itself confirms by citing the trial court's later order in a separate case (*Freeman*) to support it. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008). But more importantly, whether Mrs. Bartlett should have been allowed to present a separate claim for NIED or should have presented the claim as part of the damages in her negligence claim is immaterial. The burden of proof on Mrs. Bartlett would have been the same and, on this record, she clearly

satisfied that burden. Not only that, the jury's findings would have supported damages for NIED—whether as a separate claim or as an element of damage related to her physical injury that resulted from DuPont's negligence.

The trial court noted that under Ohio law, a plaintiff who alleges NIED in conjunction with a physical injury need not show severe and debilitating emotional distress. (R161 DMO12, PageID8339-41.) This is what the Ohio Supreme Court held in *Binns v. Fredendall*, 513 N.E.2d 278 (Ohio 1987). Only where claims of emotional distress are unaccompanied by physical injury must the injury be serious or debilitating. *See Loudin Radiology & Imaging Servs.*, 924 N.E.2d 433, 441 (Ohio Ct. App. 2009) (citing *Paugh v. Hanks*, 451 N.E.2d 759 (Ohio 1983)).

With respect to the fear of cancer, Ohio courts have held that cancerphobia alone is enough to satisfy the plaintiff's burden of proof in either situation. *See, e.g.*, *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1012 (6th Cir. 1993). Consistent with this, the trial court submitted to the jury the question of whether Mrs. Bartlett could recover damages for her emotional distress, which arose out of her actual, physical injury.

What Mrs. Bartlett had to show, in addition to the typical NIED elements, (*see* R140-1 Instr. No. 25, PageID6257), was that she had a fear of developing cancer. The latter included that she was aware that she, in fact, possessed an "increased statistical likelihood of developing cancer" and that "from this

46

knowledge springs a reasonable apprehension which manifests itself in mental distress." *Lavelle v. Owens-Corning Fiberglass Corp.*, 507 N.E.2d at 476, 481 (Ohio C.P. 1987); R140-1 Instr. No. 26, PageID6258.

What DuPont argued below is that *Binns* was distinguishable on its facts, that her cancer was not contemporaneous enough with her fear of cancer, and that Mrs. Bartlett had not met her burden with regard to her subjective fear of an increased risk of cancer, both of which the trial court rejected. (MDL4458 DMO14, PageID96007; R161 DMO12, PageID8340.) On appeal, DuPont has dropped those arguments. Instead, DuPont makes a new argument never asserted below – that the trial court "rejected" Ohio law by submitting the NIED claim to the jury as a stand-alone claim rather than as part of the damages for her physical injury. But that argument, in addition to being waived, is a red-herring, because the standard of proof is no different.

The trial court accepted DuPont's argument in the later-tried *Freeman* case, holding that the NIED damages should be given to the jury as part of the damages for the physical injury—and those NIED damages were part of the $5.1 million that the jury awarded to Mr. Freeman. In *Freeman*, however, the trial court noted, in its order, that DuPont never made this argument in *Bartlett*. (MDL4458 DMO14, PageID96007 ("In that case [Bartlett], DuPont did not raise its current argument that Ohio law does not recognize an independent cause of action for

47

NIED when the emotional distress stemmed directly from a physical injury.").)

DuPont actually cites this order (DuPont Br. 49) but fails to even acknowledge the

trial court's statement, much less even attempt to offer any excuse as to why it

failed to make the argument here, so any excuse argument also is plainly waived.

What is more important here, however, is that the argument is immaterial in

light of what the jury actually found. Indeed, the jury instructions in *Freeman* and

in this case are virtually identical in terms of what the jury had to find in order to

award damages for NIED in connection with a physical injury. The jury in

*Freeman* was told:

> To recover for cancerphobia, Mr. Freeman must have established by
> the greater weight of the evidence that he is aware that he in fact
> possesses an increased statistical likelihood of developing cancer, and
> that from this knowledge springs a reasonable apprehension which
> manifests itself in emotional distress.

(2.13-cv-01103, R102 Freeman Instr. No. 25, PageID1056.) This is exactly what

Mrs. Bartlett had to prove. (R140-1 Instr. 26, PageID6258.) If anything, Mrs.

Bartlett's burden was actually more onerous, because she had to show the separate

elements of NIED in addition to the damages. (*Id*. Instr. 25, PageID6257.)

Because the jury was not instructed that Mrs. Bartlett's negligence damages

included damages for emotional distress, there was no possibility for a double

recovery here. Indeed, the jury was specifically asked to assess negligence

damages, NIED damages, and then asked to give a total amount "without duplicating any damages." (R142, Jury Form, PageID6279.)

Thus, even if what the court did here was error and was not waived, DuPont has failed to show any actual prejudice. *Great West Cas. Co. v. P.A.M. Transp.*, 613 Fed. Appx. 509, 511 (6th Cir. 2015). In *Susan Wakeen Doll Co., Inc. v. Ashton Drake Galleries*, 272 F.3d 441, 452 (7th Cir. 2001), for example, the court noted that reversing a jury verdict based on technically erroneous instructions was inappropriate where "the applicable principles of law were communicated to the jury—through the arguments or evidence, for example." *See Great West*, 613 Fed. Appx. at 511 ("The standard on appeal for a court's charge to the jury is whether the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.").

DuPont contests none of this – it offers no argument on what exactly would have been different about Mrs. Bartlett's burden of proof or the jury instructions had the trial court submitted the NIED as a component of damages. DuPont fails to cite any proposed jury instructions that it submitted employing the "correct" standard. Indeed, DuPont refers to the NIED claim as "duplicative" without offering any argument as to how the NIED claim could have been "duplicative" here where the jury was not asked to award damages for Mrs. Bartlett's cancerphobia both on a negligence theory and on a separate NIED theory.

49

DuPont's second argument is that, if Mrs. Bartlett could have presented a stand-alone NIED claim, it was necessarily not accompanied by a physical injury and, therefore, she failed to prove that her emotional distress was severe and debilitating under cases like *Paugh*. But that will never be the case here, because Mrs. Bartlett did suffer a physical injury and DuPont has dropped any argument that the NIED did not accompany her kidney cancer.

In any event, she would have met the *Paugh* standard. "[A] *non-exhaustive* litany of *some* examples of serious emotional distress should include . . . *phobia*." 451 N.E.2d at 765 (citation omitted) (emphasis added). In *Lavelle*, the court held that "cancerphobia" can form the basis of an action for "serious emotional distress without a contemporaneous physical injury." 507 N.E.2d at 480. Here, the trial court recognized that "Ohio courts have unequivocally held that cancerphobia constitutes serious emotional distress." (MDL4234 DMO 9-A, PageID81763 (citing cases).)

DuPont attempts to mislead this Court by arguing that Ohio law requires a plaintiff to "provide some evidence beyond his or her own testimony" to prove claimed emotional distress. (DuPont Br. 49.) Ohio law is clear on this issue. In *Paugh*, 451 N.E.2d at 769, the Ohio Supreme Court held that medical testimony is *not* a requirement in a NIED case. Only "some genuine guarantee of genuineness"

is required and while expert evidence may assist a jury in this regard, it is not mandatory. *Taylor v. Streicher*, 465 Fed. Appx. 414, 423 (2012) (citation omitted).

There can be no dispute that the jury deemed Mrs. Bartlett's trial testimony genuine considering its verdict. Mrs. Bartlett suffered not only "general" emotional distress but severe emotional distress as well, because she is at an increased likelihood of a recurrence of her cancer. Mrs. Bartlett testified how "utter terror" was going through her head when she first learned that she might have kidney cancer, (R131-1 Trial Tr., PageID4554), and that she was shaking and "really, really scared." (*Id.*). Mrs. Bartlett testified she was scared that she might not be there for her family, (*id.*, PageID4555), was afraid of dying, (*id.*, PageID4558), and was scared about a procedure she had to have that would "virtually cut [her] in half," (*id.*, PageID4557); *see also id.*, PageID4573, 4583-88 (testimony regarding fear of cancer). Dr. Bahnson, her treating physician and surgeon who performed her surgery, also testified at trial that Mrs. Bartlett is at an increased risk of cancer that requires constant screening. (R128-1 Trial Tr., PageID3781-82; 3825-26.)

Thus, even if she was required to submit proof that her distress was severe and debilitating, Mrs. Bartlett still met her burden, because evidence was presented at trial demonstrating that her increased statistical likelihood of developing cancer has manifested itself as emotional distress. (MDL4211 DMO9, PageID81263; MDL4234 DMO9-A, PageID1761-64.)

51

**IV.  The District Court Properly Concluded That Ohio's Tort Reform Act Of 2004 Did Not Apply To Mrs. Bartlett's Case.**

The District Court twice correctly determined that Ohio's Tort Reform Act does not apply to Mrs. Bartlett's claims. DuPont's efforts to now argue otherwise remain flawed. Applying Ohio's limitation on noneconomic damages, Ohio Rev. Code § 2315.18, to Mrs. Bartlett's claims would constitute an impermissible retroactive application of a prospective statute. Even assuming *arguendo* that a statute may apply to claims which accrued under a separate statute of limitations after the effective date of the statute, regardless of when the defendant's tortious conduct or plaintiff's injury occurred, Mrs. Bartlett's claims clearly accrued prior to the effective date of Ohio's 2004 Tort Reform Act.

**A.  Application Of Ohio's Tort Reform Act Would Be Impermissibly Retroactive.**

Applying Ohio Rev. Code § 2315.18's limitation on the recovery of noneconomic damages to Mrs. Bartlett—a plaintiff who suffered injuries as a result of DuPont's conduct before the effective date of the statute—violates Ohio's general principle against retroactive application of statutes. In its effort to thrust a statute of limitations on an inquiry concerning the retroactive application of a statute, DuPont ignores relevant precedent, statutory language, and legislative history.

Under Ohio law, "[a] statute is presumed to be prospective in its operation unless expressly made retrospective." Ohio Rev. Code § 1.48. Courts recognize - and DuPont does not dispute - that Ohio's noneconomic damages cap, Ohio Rev. Code § 2315.18(B)(2) does ***not*** apply retrospectively, and therefore must be applied prospectively. *Heffelfinger v. Connolly*, 2009 WL 112792, at *2 (N.D. Ohio Jan. 15, 2009).

"A prospective statute applies to claims that arise and regulates conduct that occurs after its effective date." *Dukes v. Ohio Dep't of Job & Family Servs.*, No. 09AP-515, 2009 WL 4932723, at *3 (Ohio Ct. App. Dec. 22, 2009) (citing *Sorenson v. Tenuta*, 62 Ohio App.3d 696, 702 (1989)). In other words, the focus of the court's inquiry in determining whether a prospective statute applies is whether the tortious conduct of the defendant and the resulting injury to the plaintiff occurred before the effective date of the statute.

For example, in *Sorenson*, the Ohio Court of Appeals recognized that a prospective statute enacted in 1985 would be impermissibly applied retroactively if it were applied to a cause of action that arose in 1984 - the time the harm to the plaintiff and the wrongful conduct by the defendant occurred - even though the plaintiff did not discover his cause of action, and therefore his cause of action did not ***accrue*** for statute of limitations purposes, until 1986. 62 Ohio App.3d at 701-03; *see also Blair v. McDonagh*, 894 N.E.2d 377, 391 (Ohio Ct. App. 2008)

(focusing on when defendant's "conduct" occurred—"the current version of R.C. 2315.21 cannot be applied retroactively to that conduct").

With respect to Ohio's damages caps contained in the Ohio Tort Reform Act of 2004, as the District Court accurately observed, "[c]ourts have routinely held that the relevant date for determining whether the [Tort Reform Act] applies is the date the conduct giving rise to the plaintiff's cause of action occurred." (R161 DMO12, PageID8347 (quoting *Heffelfinger*, 2009 WL 112792 at *3)); *see also Blair*, 894 N.E.2d at 391 ("[A] court cannot apply [the tort caps] to causes of action that arose before the statute's effective date even if some of the conduct giving rise to the cause of action occurred after the statute's effective date.") (citing, *inter alia*, *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*, 611 N.E.2d 955, 966 (Ohio Ct. App 1992) (reaching same result under previous version of tort reform in Ohio)).

Here, DuPont began releasing C-8 into the environment in the 1950s. Mrs. Bartlett was exposed to C-8 in her drinking water beginning in 1983, developed her injury, and in 1997 was diagnosed with kidney cancer. Therefore, at the very latest, Mrs. Bartlett's claim arose for purposes of retroactive application in 1997, regardless of when her claim independently accrued under the statute of limitations. (MDL4215 DMO10, PageID81296.)

DuPont argues that, in determining whether a prospective statute is impermissibly applied retroactively, the tortious conduct of the defendant and corresponding injury to the plaintiff are irrelevant. Rather, DuPont maintains that so long as the effective date of the statute precedes the date of accrual under the corresponding statute of limitations, application of the statute is permissible. DuPont's theory and the line of cases it cites for support rely on *Browning v. Burt*, 613 N.E.2d 993 (Ohio 1993), an Ohio Supreme Court decision which ruled the use of "accrued" and "arise" are synonymous when used in two statutes of limitations. But DuPont's efforts to inject principles concerning statutes of limitations into common law principles of retroactivity based on *Browning* and related cases are misguided.

As the District Court correctly pointed out, although "accrue" and "arise" may be synonymous when used in two statutes of limitations, this does not inform the meaning of the terms when used for the purposes of determining retroactivity. In fact, as the District Court noted, circuit and district courts across the country have recognized that the terms may have different meanings in different contexts. (R161 DMO12, PageID8349-50.)

In addition, DuPont overlooks the fact that the *Browning* Court—in 1993— did not have the benefit of the Ohio Tort Reform Act's amended statutory language applicable to § 2305.10. In 2004, the Ohio General Assembly not only added a

55

discovery rule for toxic torts to the statute of limitations for bodily injury, but *also* changed the language of the triggering event. Prior to the 2004 amendments, § 2305.10 declared an action must be brought within two years after the "cause thereof *arose*." The General Assembly changed that language, requiring the action to be brought two years after the "cause of action *accrues*." Am. Sub. S.B. No. 80, p.17. Courts must give effect to the language the legislature chose to employ in a statute and presume the legislature had a reason for making any changes. *In re Andrew*, 895 N.E. 2d 166, 168 (Ohio 2008). Here, the General Assembly changed the statutory language because it understood that "arose" and "accrue" were *not* always synonymous when used in different contexts and sought to avoid confusion. The amended language harmonizes § 2305.10 with other statutes of limitation and insures principles applicable to when a claim *arises* for purposes of retroactivity are not confused with when a claim *accrues* for statutes of limitations purposes.

Applying the toxic tort statute of limitations found in § 2305.10 to the compensatory damages limitation found in § 2315.18 also would ignore the construction of the statute as a whole. *See, e.g., State v. Everette*, 951 N.E.2d 1018, 1023 (Ohio 2011) (recognizing that a "guiding principle of statutory interpretation is that the statute must be construed as a whole"). The General Assembly expressly qualified the statute of limitations by way of § 2305.10(G), stating that it was to

apply in a remedial manner "regardless of when the cause of action accrued." Ohio Rev. Code § 2305.10(G) (as amended). Likewise, had the Legislature wished to qualify the application of § 2315.18 based on when a cause of action had accrued, it could have easily done so. This Court should not base prospective application of § 2315.18 on the accrual of a claim under the statute of limitations and insert statutory language where there is none.

In sum, there is no indication in the statute, relevant case law, or history of Ohio tort reform that the General Assembly intended a prospective compensatory damages cap to be applied based on the date the cause of action accrued under the action's corresponding statute of limitations. Such application would be impermissibly retroactive. Rather, under Ohio law, § 2315.18 may only be applied prospectively to claims arising from tortious conduct and resulting injuries that occur after the effective date of the statute.

### B.   Mrs. Bartlett's Claims Accrued Prior To The Effective Date Of The Tort Reform Act.

Even if DuPont is correct, and § 2315.18 may be applied to claims that, per § 2305.10, "accrue" after the effective date of the Act, Mrs. Bartlett's claims clearly accrued under the statute of limitations before April 7, 2005.

Under Ohio law, statutes of limitations concerning latent diseases are liberally construed in favor of the plaintiff. *Lidell v. SCA Servs. of Ohio, Inc.*, 635 N.E.2d 1233, 1238 (Ohio 1994). "[R]igid application" of the statute to the

disadvantage of plaintiffs is disfavored. *Id*. When a statute of limitations incorporates a discovery rule, "*constructive* knowledge of facts, rather than *actual* knowledge of their legal significance" may be sufficient for a claim to accrue. *Flowers v. Walker*, 589 N.E.2d 1284, 1287 (Ohio 1992). "A plaintiff need not have discovered all the relevant facts necessary to file a claim in order to trigger the statute of limitations." *Id*.   In other words, the touchstone for whether a toxic tort plaintiff's cause of action has accrued is whether it is "far enough along the scale of clarity and certainty of condition and cause to trigger the running of the statute." *Cacciacarne v. G.D. Searle & Co.*, 908 F.2d 95, 98 (6th Cir. 1990).

Here, as the trial court determined, Mrs. Bartlett began drinking water tainted with C-8 in 1983 and was diagnosed with kidney cancer in 1997. In 2001, she was named as part of a purported class of individuals exposed to C-8. In 2004, Class counsel served interrogatory responses identifying expert testimony that Class Members' exposure to C-8 was sufficient to cause cancer, and sent a Class-wide, direct-mail written notice to all members of the Class explaining the *Leach* Settlement and the preservation of their claims. Furthermore, there were repeated publications of notice in local and national newspapers concerning C-8 and the *Leach* Settlement. (*See* R161 DMO12, PageID8350-51; *see also Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (recognizing that media

attention alone can be sufficient to charge the plaintiff with constructive knowledge of the events underlying her claim).)

Mrs. Bartlett's actual knowledge of her cancer and constructive knowledge that her injury was related to her exposure to C-8 advanced her claim "far enough along the scale of clarity and certainty" that it accrued prior to April 7, 2005.

DuPont's position, requiring Mrs. Bartlett to have actual knowledge of the link between her kidney cancer and her C-8 exposure effectively eliminates the opportunity for a claim to accrue when a plaintiff, through reasonable diligence, "should have known" that her injury was related to her exposure. *See*, Ohio Rev. Code §2305.10(A)-(B)(1). DuPont cannot have its cake and eat it too.[9] If, as DuPont contends, the date of accrual under the statute of limitations is determinative of when a damages cap may be applied without impermissible retroactive effect, then Mrs. Bartlett's cause of action must have accrued in 2004— when through reasonable diligence, Mrs. Bartlett should have known by way of the Class-wide notice and repeated publications that C-8 was related to her injury.

---

[9] The irony of DuPont's argument is two-fold. Vigorous enforcement of statutes of limitations unquestionably benefits defendants. *Liddell v. SCA Serv. of Ohio, Inc.*, 635 N.E.2d 1233, 1237 (Ohio 1994) (recognizing that the rationale for statutes of limitation is to "ensure fairness to defendant"). Discovery rules have traditionally been incorporated into statutes of limitations to prevent unfair treatment of plaintiffs who suffer latent injuries. *Id*. For DuPont to now commandeer this traditional protection for plaintiffs for its own purposes rings insincere at best.

## CONCLUSION

For the reasons given above, this Court should affirm the trial court's judgment in all respects.

Respectfully submitted,

/s/ *John B. Nalbandian*
John B. Nalbandian
Robert A. Bilott
Kevin J. Madonna                 Taft Stettinius & Hollister LLP
Kennedy & Madonna, LLP           425 Walnut Street, Suite 1800
48 Dewitt Mills Rd.              Cincinnati, OH 45202-3957
Hurley, NY  12443               Telephone: 513-381-2838
Telephone:  845-481-2622         Facsimile: 513-381-0205
Facsimile:  845-230-3111         nalbandian@taftlaw.com
kmadonna@kennedymadonna.com      bilott@taftlaw.com

David J. Butler
Taft Stettinius & Hollister LLP
65 East State Street, Suite 1000
Columbus, OH  43215-4213
Telephone:  (614) 221-2838
Facsimile:  (614) 221-2007
dbutler@taftlaw.com

*Counsel for Plaintiff-Appellee*
*Carla Marie Bartlett*

## CERTIFICATE OF COMPLIANCE

**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
      32(a)(7)(B) because:

      [x]    this brief contains 13,962 words, excluding the parts of the brief
             exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      [x]    this brief has been prepared in a proportionally spaced typeface using
             Microsoft word in 14-point Times New Roman font.

Dated July 28, 2016.

                                        */s/ John B. Nalbandian*_____

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed in the Court's CM/ECF system

on July 28, 2016, and that this system will serve counsel of record.

*/s/ John B. Nalbandian*

## ADDENDUM

In addition to the documents previously designated by Defendant, Plaintiffs hereby designate the following filings in the district court's record for Case No. 2:13-cv-170 and Case No. 2:13-md-2433 as relevant pursuant to Sixth Circuit Rule 28:

**From the <u>Bartlett</u> Case:**

| <u>Doc. No.:</u> | <u>PageID#</u> | <u>Description</u> |
| --- | --- | --- |
| 128-1 | 3781-82, 3825-26 | Trial Transcript for September 22, 2015 |
| 131-1 | 4554-55, 4557-58, 4573, 4583-88, 4673, 4678 | Trial Transcript for September 24, 2015 |
| 133 | 5192-95 | Trial Transcript for September 30, 2015 |
| 136 | 5610-14, 5617-36, 5654, 5656-59, 5690, 5707-08, 5728, 5739 | Redacted Trial Transcript for October 1, 2015 |
| 140 | 6251-52 | Jury Instructions |
| 140-1 | 6232, 6251-52, 6257-58 | Jury Instructions |
| 142 | 6279 | Jury Verdict Form |
| 145 | 6398-99 | Trial Transcript for October 6, 2015 |
| 154 | 7162 | Trial Transcript for September 15, 2015 |
| 156-1 | 7729 | Trial Transcript for September 17, 2015 |
| 156-2 | 7813 | Trial Transcript for September 17, 2015 |
| 161 | 8241-43, 8245, 8258-8328, 8339-41, 8347, 8349-51 | Dispositive Motions Order No. 12 |

**From the MDL**:

| Doc. No.: | PageID# | Description |
|---|---|---|
| 35 | 298 | DuPont Answer to *Bartlett* Complaint |
| 820-8 | 11803-07, 11809-13, 11823-28, 11831 | Class Action Settlement Agreement in *Leach* case |
| 820-9 | 11833, 11840, 11844 | Final Order in *Leach* case |
| 820-11 | 11857 | Notice of Settlement in *Leach* case |
| 820-13 | 11865-72 | Motion, Stipulation and Order of Dismissal in *Leach* case |
| 820-21 | 11981 | Letter from DuPont's counsel in *Leach* case |
| 820-22 | 11987 | Responses to Requests for Admission Nos. 147 and 148 in *Leach* case |
| 820-23 | 11993 | Guzelian Expert Report for DuPont in *Rowe* case |
| 820-25 | 12001-03 | DuPont Memorandum filed in *Rowe* case |
| 820-27 | 12012-13 | Hearing transcript in *Leach* case |
| 1152-4 | 15730 | Journal article |
| 1152-11 | 15833 | Science Panel Probable Link Findings |
| 1679 | 22981-85 | Dispositive Motions Order No. 1 |
| 2702-3 | 40210-12 | Smith Expert Report for Plfs. |
| 2702-6 | 41005-06 | MacIntosh Expert Report for Plfs. |
| 3441-3 | 59750-82 | Petty Expert Report for Plfs. |
| 3441-1 | 59344-400 | Amter Expert Report for Plfs. |
| 3972 | 68165, 68167-71, 68173-74 | Dispositive Motions Order No. 1-A |

| Doc. No.: | PageID# | Description |
|---|---|---|
| 4079 | 71850, 71856, 71861 | Evidentiary Motions Order No. 1 |
| 4129 | 78664, 78670-74, 78686-90 | Evidentiary Motions Order No. 2 |
| 4150 | 78958-59 | Response in Opposition to Motion in Limine No. 15, filed by DuPont |
| 4184 | 80086-90 | Dispositive Motions Order No. 6 |
| 4206 | 80887 | Motions in Limine Order No. 2 |
| 4211 | 81263 | Dispositive Motions Order No. 9 |
| 4215 | 81296 | Dispositive Motions Order No. 10 |
| 4226 | 81637 | Evidentiary Motions Order No. 1-A |
| 4234 | 81761-64 | Dispositive Motions Order No. 9-A |
| 4235 | 81770-78 | Dispositive Motions Order No. 11 |
| 4458 | 96007 | Dispositive Motions Order No. 14 |